## IN THE SUPREME COURT OF MISSISSIPPI

### NO. 93-KA-00225-SCT

*THERON RAY MORGAN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/30/93 |
| TRIAL JUDGE: | HON. ALFRED THAD LEGGETT III |
| COURT FROM WHICH APPEALED: | PIKE COUNTY COUNTY COURT |
| ATTORNEY FOR APPELLANT: | ALFRED LEE FELDER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CHARLES W. MARIS, JR. |
| DISTRICT ATTORNEY: | LAMPTON, DUNN, |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 5/29/97 |
| MOTION FOR REHEARING FILED: | 7/9/97 |
| MANDATE ISSUED: | 12/15/97 |

**BEFORE PRATHER, P.J., PITTMAN AND SMITH, JJ.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. Originally, this opinion was designated not for publication. Upon the Court's own motion the original opinion is withdrawn and this one substituted therefor.

¶2. Theron Ray Morgan was arrested on August 20, 1991, in a reverse sting operation carried out by the Mississippi Bureau of Narcotics. Morgan was arrested at his residence after his co-conspirator and an undercover agent delivered ten pounds of marijuana to Morgan as a result of a pre-arranged sale. Morgan was indicted for conspiracy to possess more than one kilogram of marijuana and for unlawful possession of more than one kilogram of marijuana. Following a jury trial, Morgan was convicted and sentenced to twenty years in the custody of the Department of Corrections and assessed a fine in the amount of $50,000.

¶3. Morgan now appeals his conviction from the Circuit Court of Pike County to this Court arguing that the trial court erroneously overruled his motion for a directed verdict and denied his request for

an jury instruction on the entrapment defense. Morgan also argues that two instances of prosecutorial misconduct warrant a new trial.

## STATEMENT OF FACTS

¶4. During August of 1991, the Mississippi Bureau of Narcotics (hereinafter "MBN") learned from a confidential informant that Luke Reid was seeking to purchase forty pounds of marijuana. Agents obtained marijuana from the MBN vault in Jackson, Mississippi to use in a reverse sale with Reid. MBN Agent Ronnie Frazier arranged a meeting between Reid and undercover MBN Agent Scott Biggers as a result of which Reid agreed to pay $40,000 for forty pounds of marijuana to be delivered by Biggers.

¶5. Through subsequent telephone conversations, Reid and Biggers agreed to meet near Bude, Mississippi under the Homochitto River Bridge. At approximately 2:40 p.m., Reid arrived at the bridge to meet Biggers. Biggers gave Reid 40 pounds of marijuana in exchange for $31,000 in cash and a check for $9,000 written by Jesse Andrews. After receiving the marijuana, Reid was arrested by MBN agents, agreed to cooperate and informed agents that two additional investors were involved in the deal. Jesse Andrews was arrested while he awaited delivery of his portion of the marijuana.

¶6. Reid also agreed to lead agents to Paul Pittman, the other investor in the drug transaction who was awaiting delivery of ten pounds of marijuana. Reid contacted Pittman and arranged a meeting to deliver the marijuana. Agent Biggers accompanied Reid to the Topisaw River Bridge in Pike County. Reid wore a body transmitter to allow surveillance agents to monitor the transaction. Pittman was at the bridge when Biggers and Reid arrived and Pittman, like Reid, was arrested after receiving the marijuana. Agent Biggers and Reid were also arrested to confuse Pittman.

¶7. During the transaction between Reid and Pittman, Reid told Pittman to "[t]ell your man Ray that a pound of that is yours." Agent Frazier testified that the name "Ray" was used three times, but that at that time agents did not know who "Ray" was. Pittman maintained that he was picking up the marijuana for someone else and agreed to cooperate with the agents and deliver the marijuana to "Ray." MBN Agent Kenny Cotton accompanied Pittman in making the delivery. After arriving at "Ray's" house, officers realized that the investor was Ray Morgan. Cotton and Pittman brought along an extra brick of marijuana to sell to Morgan in order to explain Agent Cotton's presence.

¶8. On August 20, 1991, Agent Cotton and Pittman drove in Pittman's car to Morgan's home where Morgan was waiting outside. Agent Cotton was equipped with a mini-cassette recorder. A transcript of the drug transaction was introduced into evidence at trial and revealed the following:

Morgan: I got a bunch of friends around back that don't need to know so run on in.

Cotton: Hey, check it out.

Morgan: Alright.

unknown: You got it.

Cotton: Okay, that's going to be, uh, what we deal for?

Morgan: What?

Cotton: Is that going to be what we're dealing for?

Morgan: What are you talking about?

Cotton: You know what I'm saying. Everything is straight, man, I'm just checking with you, you said you got people here.

Morgan: Yeah, well they cool, it's just they don't need to know my business.

Pittman: mumbling.

Morgan: What's wrong with your eye?

Pittman: mumbling.

Morgan: I hear you. Where's the scales at?

* * *

Morgan: How much was we talking about, we must not have some kind of understanding here. I thought we were talking about ten, that's ten.

Cotton: That's why I'm here, right. What I'm saying, you want to do a better deal on this other.

Morgan: I don't know, looks pretty.

Cotton: It is, it's some good * * * man.

Morgan: Where's the cash?

Cotton: We trade cash for the dope right?

Morgan: Talk to me Moke.

Pittman:

aka "Moke": I don't know, cash for the dope.

Morgan: Yeah, I know, who's got the cash.

Cotton: Well, my guy got the cash.

Morgan: Okay, well, that's what I'm asking.

* * *

Morgan: I mean if I'm going to buy this much I need to at least see it.

Cotton: Yeah. Go ahead, cut it.

Morgan: You got a paper?

Cotton: Naw, I ain't got a paper.

\* \* \*

Cotton: The deal here is that I need to get rid of and I thought maybe you could help me on this. You provided what? nine-five.

Morgan: Yeah.

Cotton: Nine thousand five hundred.

Morgan: Nine thousand five hundred.

Cotton: For ten pounds.

Morgan: Right.

¶9. In addition to the tape, Pittman, Morgan, and Agent Cotton testified as to the events surrounding the transaction. Pittman testified that he was at Ray's house when they first discussed the deal with Reid. Pittman had no money, however, he knew that Morgan did. Morgan placed an order for ten pounds which according to Reid would cost $9, 500. On August 19, 1991, Morgan and Pittman went to the bank where bank records reveal Morgan withdrew $8,000. Pittman testified that Morgan gave him $9,500 which he later gave to Reid.

¶10. Morgan consistently maintained that he gave Pittman $8,000 to purchase a car, not marijuana. Pittman, however, denied that Morgan purchased his car. Rather, Pittman testified that after his arrest he asked Morgan for money to retain a lawyer. Pittman testified that Morgan gave him $1,000 in exchange for which Morgan required Pittman to surrender his car as collateral. On cross-examination Morgan conceded that the title to the automobile which he allegedly purchased was never transferred into his name.

¶11. At trial, Morgan attempted to raise an entrapment defense and claimed that the State could not show evidence of his predisposition to distribute or purchase marijuana. Morgan also argued that State involvement in the reverse sale was excessive. Morgan relied heavily on a pre-trial statement made by Pittman, memorialized in writing and on videotape, which completely exonerated Morgan. This statement was arranged by an investigator hired by Morgan's defense attorney, Alfred Felder, and took place at Morgan's home. Pittman testified that this statement was taken during a time when he believed that Morgan's attorney would also handle his case. After the statement was secured, Felder referred Pittman to another attorney, John Price. However, at trial Pittman testified that the statement was not true.

¶12. Following the trial, Morgan was convicted of conspiracy to possess more than one kilogram of marijuana and unlawful possession of more than one kilogram of marijuana. Morgan was sentenced to twenty years in the custody of the Mississippi Department of Corrections and assessed a fine in the amount of $50,000. Aggrieved, Morgan appeals to this Court.

**DISCUSSION OF LAW**

## I. WHETHER THE TRIAL COURT ERRED IN REFUSING TO GRANT A DIRECTED VERDICT.

¶13. Morgan argues that the trial court erroneously denied his motion for a directed verdict at the end of the State's case because the he established entrapment as a matter of law. Morgan argues that the conduct of law enforcement officials in carrying out the reverse sale operation was sufficient to establish entrapment as a matter of law. Morgan principally relies on this Court's decisions in *Barnes v. State*, 493 So. 2d 313 (Miss.1986), and *Kemp v. State*, 518 So. 2d 625 (Miss.1988).

¶14. In *Hopson v. State*, 625 So.2d 395 (Miss.1993), this Court set forth the standard of review for directed verdict motions as follows:

> This Court has stated that all evidence, including that which does not support the State's case, must be considered in the light most favorable to the State as verdict winner. *Burge v. State*, 472 So.2d 392, 393 (Miss.1985). Furthermore, the State must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. *Glass v. State*, 278 So.2d 384, 386 (Miss.1973). "We may reverse only where the evidence is such that reasonable and fair-minded jurors could only find the defendant not guilty. [Citations omitted.]" *Heidel v. State*, 587 So. 2d 835, 838 (Miss.1991).

*Id.* at 405.

¶15. This Court recently reiterated Mississippi law on entrapment in *Walls v. State*, 672 So. 2d 1227, 1230 (Miss.1996) as follows:

> Entrapment has been defined as "the act of inducing or leading a person to commit a crime not originally contemplated by him, for the purpose of trapping him for the offense." The defense of entrapment is affirmative and must be proved by the defendant. If the defendant already possesses the criminal intent, and the request or inducement merely gave the defendant the opportunity to commit what he or she was already predisposed to do, entrapment is not a defense. Before a defendant can raise the defense of entrapment, he or she is required to show evidence of government inducement to commit the criminal act and a lack of predisposition to engage in the criminal act prior to contact with government agents. *Hopson v. State*, 625 So.2d 395, 399-400 (Miss. 1993) (citations omitted).

¶16. Morgan first argues that the State failed to demonstrate that he was predisposed to commit the crimes of conspiracy to possess or possession of marijuana. Specifically, Morgan argues that "none of the State witnesses could offer any evidence. . . that Ray Morgan was in any way involved in the purchase of narcotic drugs." In essence, Morgan argues "[b]ut for the State taking 40 pounds of marijuana out of its vault, making Luke Reid buy more than he was initially attempting to buy, and then beating up a defendant and forcing him to drive the agents to the home of Theron Ray Morgan, is there any proof that Theron Ray Morgan would in any way be anywhere near the marijuana in this case."

¶17. Morgan, however, ignores the fact that Paul Pittman testified at trial that he and Morgan agreed

to purchase the marijuana that was later delivered by Pittman and Agent Cotton. Morgan correctly argues that agents did not initially know of Morgan's involvement in the drug transaction. MBN Agent Frazier testified that MBN was unaware of Morgan's involvement in the conspiracy until Pittman's arrest. However, after the arrest of Pittman, the remainder of the conspiracy unraveled and Pittman disclosed to law enforcement that he was simply retrieving the marijuana for another and agreed to aid law enforcement in completing the delivery. Pittman also testified that he and Morgan went to the bank on the day before Morgan's arrest where Morgan withdrew money with which Pittman could purchase the marijuana. Pittman testified that upon returning to the car Morgan gave him the money. Moreover, Morgan admitted withdrawing eight thousand dollars from the bank on August 19, 1991, the day before the drug transactions took place. Although Morgan argues that this money was used to purchase an automobile from Pittman, the evidence revealed that the title of the automobile was never transferred into his name and that he only took possession of the automobile several weeks after the alleged purchase.

¶18. There was ample evidence from which a jury could conclude that Morgan was predisposed to conspire to possess marijuana or to possess marijuana. Here, as argued by the State, the parties to the conspiracy, Reid, Andrews, Pittman, and Morgan agreed to purchase forty pounds of marijuana. The crime of conspiracy was complete upon the agreement to exchange the money for the marijuana. *See Mitchell v. State*, 572 So.2d 865, 867 (Miss.1990). Moreover, the tape and transcript of the delivery to Morgan reveals no indication that Morgan rejected delivery of the marijuana.

¶19. The crux of Morgan's argument is that the conduct of law enforcement transgressed boundaries set forth by this Court in *Barnes v. State*, 493 So.2d 313 (Miss.1986) and *Kemp v. State*, 518 So.2d 625 (Miss.1988). In effect, Morgan argues that the official misconduct of law enforcement overshadows evidence of Morgan's predisposition. Specifically, Morgan relies on this Court's opinion in *Moore v. State*, 534 So. 2d 557, 559 (Miss.1988), wherein this Court held one factor which emerges from our entrapment decisions is that of misconduct on the part of law enforcement authorities. Going further, this Court held:

> An indication of an excessive degree of involvement on behalf of the state might be the situation where the state was both supplier and purchaser of contraband. However, there may be other situations where the criminal design would be that of the state rather than the defendant simply because the state was so inexorably intertwined that the crime would not have been committed but for its involvement.

*Id.* at 559. Morgan argues several circumstances demonstrate that the state was "inexorably intertwined" in the instant case.

¶20. Morgan first focuses on the contrast between the treatment of himself and that of Reid, Andrews, and Pittman. Morgan repeatedly emphasizes the fact that Reid, Andrews, and Pittman were called to meet agents in a public place whereas Agent Cotton and Pittman drove to Morgan's home to deliver the marijuana. Morgan notes that he, unlike the others, was in the process of building a 7,000 square foot home worth approximately $400,000. Moreover, Morgan cites the testimony of DEA Agent Monachello, who testified that the home had been seized by law enforcement. In essence, Morgan argues that possible forfeiture of the home motivated law enforcement to target and entrap him.

¶21. Despite Morgan's allegations, State agents were unaware of Morgan's participation in the conspiracy until Paul Pittman was arrested and led them to Morgan's home in rural Pike County. In addition, the location of the delivery of the marijuana is of no legal significance. Moreover, the transcript of the taped conversation reflects that Pittman and Cotton were invited in by Morgan; the marijuana was weighed on scales; and Morgan suggested that they "smoke one" to ascertain the quality of the drug.

¶22. Morgan next argues that the evidence presented at trial did not prove that he was involved in negotiations for the purchase of the marijuana. Again, Morgan ignores the testimony of Paul Pittman. As stated earlier, Pittman testified that he and Morgan agreed to purchase the marijuana from Reid. Pittman further testified that he and Morgan went to the bank where Morgan withdrew money and gave it to Pittman to purchase the marijuana. Bank records confirm that $8,000 was withdrawn from Morgan's account the day before Pittman delivered the marijuana. Moreover, the tape recording of the delivery by Agent Cotton and Pittman discloses no evidence that Morgan rejected the delivery of the marijuana, but rather demonstrates that Morgan knew the price and the amount.

¶23. Morgan next argues that Pittman initially denied that there was anyone else involved in the transaction and only recalled Morgan's involvement after being beaten by law enforcement after his arrest. Booking photographs of Pittman were introduced into evidence to demonstrate Pittman's injuries. The photographs depict Pittman with a swollen face and red eyes. The transcript of the transaction at Morgan's home indicates that Morgan noticed Pittman's injuries as well and inquired of Pittman "What's wrong with your eye?" Moreover, Pittman detailed the alleged beating by law enforcement in a videotaped statement given to Morgan's investigator. Pittman also stated that he was forced to take agents to Ray Morgan's home after being threatened.

¶24. The veracity of this statement, which completely exonerated Morgan, was challenged by the State at trial. Pittman testified that he could not read, but he had signed his name to the statement. When the contents of the statement were read to him, Pittman denied portions of the statement. Specifically, Pittman denied that Morgan had purchased his car for $8,000 or that, as the statement claimed, Morgan had nothing to do with the drug deal. However, Pittman maintained that law enforcement agents "slapped him around" when he was slow to answer questions regarding Morgan. Pittman testified that he made the statement while believing that Morgan's defense attorney would also represent him.

¶25. While there is certainly conflicting evidence regarding the alleged beating of Pittman as well as the truth of the statement given to Morgan's investigator, Pittman consistently indicated that he and Ray Morgan agreed to purchase ten pounds of marijuana from Reid; that he and Morgan went to the bank where Morgan withdrew the money to purchase the marijuana; and that he later met Reid to accept delivery of the marijuana.

¶26. Despite the evidence, Morgan argues that the overinvolvement of law enforcement constituted entrapment as a matter of law. Morgan principally relies *Barnes v. State*, 493 So. 2d 313 (Miss.1986) and *Kemp v. State*, 518 So. 2d 625 (Miss.1988). In *Barnes*, like the case *sub judice*, this Court was faced with a "reverse-sale" operation. In *Barnes*, MBN, relying on information from a confidential informant, loaded marijuana from the MBN vault and traveled with the marijuana to a location at which the confidential informant recognized Bell, a known drug trafficker. Barnes and

Williams were in the vehicle with Bell. Williams entered the MBN van and inspected the bales of marijuana and inquired about the price. An undercover MBN agent quoted Williams a price and requested that they meet at 10:30 p.m. to make the exchange.

¶27. At 10:30 p.m., Agent Campbell met Williams, Bell, and Barnes to ascertain whether they had the money. Agent Campbell then instructed the trio to meet him on Lakeland Drive to make the actual exchange. Initially, the trio followed Agent Campbell, however, at some point the car in which they were traveling stopped. The suspects indicated to Agent Campbell that they did not like the place to which he was going and suggested another meeting place. Agent Campbell refused and left the scene. Following a car chase, the suspects were apprehended and charged with conspiracy to possess marijuana.

¶28. This Court held that "the uncontradicted evidence and inferences therefrom introduced by the State show that the State owned the marijuana and was attempting to sell or furnish the marijuana to the appellant and his colleagues; that their predisposition to commit the crime was instigated by the officers; and that the "reverse sale" or "reverse undercover operation" . . . embraces the requirements and definition for "entrapment." *Id.* at 316. This Court reversed Barnes' conviction and ordered him discharged.

¶29. Two years later, this Court was confronted with a reverse sale in ***Kemp v. State***, 518 So. 2d 656 (Miss.1988). In ***Kemp***, an undercover agent asked Collins if he knew anyone who would be interested in purchasing two forty-pound bales of marijuana. Collins said he did not but would speak to his partner. Collins then indicated that he could come up with $8,000 for forty pounds. Two days later, Collins, Kemp, and two others met MBN agents in a parking lot. Kemp cut open the bale of marijuana which was stored in the MBN van. Upon the agents' request, Kemp displayed a green bank bag containing $10,000. MBN agents agreed to make the exchange at another location where other officers were stationed. After their arrival, Kemp and Curtis weighed the bale and after Collins gave the agents the green bank bag, the officers arrested the four individuals.

¶30. Based on these facts, this Court stated "[w]e repeat for the edification of narcotics agents throughout the State of Mississippi that the rule in Mississippi as laid out in ***Barnes***, *supra*, is that a reverse sale or a reverse undercover operation . . . embraces all the elements and requirements for the definition of entrapment." *Id.* As in ***Barnes***, this Court ordered the defendant discharged.

***¶31.*** Morgan argues that the facts presented in the case *sub judice* mirror those presented in ***Barnes*** and ***Kemp*** and therefore warrant reversal. ***Barnes***, ***Kemp***, and the case *sub judice* each involve a reverse sale wherein narcotics officers sell drugs owned by the State to suspected drug traffickers or dealers. In the instant case, MBN learned from a confidential informant that Luke Reid was in the market for forty pounds of marijuana. Undercover MBN Agent Scott Biggers then began negotiations with Reid for the price and date of delivery. Biggers procured the desired amount from the MBN vault in Jackson and exchanged the marijuana for $31,000 in cash and a $9,000 check.

¶32. The similarities among the cases cease after Reid's arrest. Here, this Court is presented with a unique situation where after a reverse sale, the agents obtained the names and locations of additional investors and began making the anticipated deliveries. Therefore, the State argues that while Reid may have valid a argument under ***Barnes*** and ***Kemp***, Morgan simply does not.

¶33. Specifically, the State argues that Morgan has no remedy under the **Barnes** and **Kemp** decisions because the conspiracy was complete upon the agreement between Pittman and Morgan. In **Barnes** and **Kemp**, each defendant was charged and convicted of conspiracy to possess marijuana as was Morgan. The cases may be distinguished by examining the nature of a conspiracy in light of the entrapment defense.

¶34. A charge of conspiracy lies when two or more persons agree to commit a crime or agree to accomplish a lawful purpose unlawfully. *See* Miss. Code Ann. § 97-1-1. In **Barnes** and **Kemp**, the "agreement" to purchase marijuana was between the suspect and an undercover MBN agent. By definition, "[e]ntrapment . . . consists of inducing or leading a person to commit a crime not originally contemplated by him, for the purpose of trapping him in its commission and prosecuting him for the offense." **Barnes**, 493 So. 2d at 315. In **Barnes** and **Kemp**, the undercover agent agreed to sell marijuana to the suspect in order to arrest and prosecute him for the offense. Thus, the defense of entrapment negated the conspiracy in the reverse sale situation. However, in the case *sub judice*, the conspiracy was complete upon the agreement between Pittman and Morgan. At the time of the conspiracy, law enforcement was not involved nor was Pittman acting as a confidential informant. Thus, the conspiracy charge in the case *sub judice* does not rest upon factual circumstances similar to those present in **Barnes** or **Kemp.** As a result, the evidence in the case *sub judice* is not such that reasonable and fair-minded jurors could only find the defendant not guilty. The trial court did not err in refusing to grant Morgan's motion for a directed verdict. This issue is without merit.

## II. WHETHER THE TRIAL COURT ERRED IN REFUSING TO GRANT THE DEFENDANT'S ENTRAPMENT INSTRUCTION.

¶35. In **Hopson v. State**, 625 So.2d 395 (Miss. 1993), this Court adopted **Matthews v. United States**, 485 U.S. 58 (1988), wherein the United States Supreme Court held that a defendant may assert an entrapment defense although he denies committing one or more elements of the crime. **Hopson**, 625 So.2d at 399-401.

¶36. "As a rule, judicial decisions apply 'retroactively.' Indeed, a legal system based on precedent has a built-in presumption of retroactivity." **Solem v. Stumes**, 465 U.S. 638, 642-43 (1984) (citation omitted). The United States Supreme Court has on several occasions held that new decisions that affect the process of determining guilt or innocence and which could well lead to acquittal should be given retroactive effect. **Michigan v. Payne**, 412 U.S. 47, 61-62 (1973) (Justice Marshall dissenting) (citing **Gideon v. Wainwright**, 372 U.S. 335 (1963); **In re Winship**, 397 U.S. 358 (1970); **Pickelsimer v. Wainwright**, 375 U.S. 2 (1963); **Ivan V. v. New York**, 407 U.S. 203 (1972); **Adams v. Illinois**, 405 U.S. 278 (1972)). This Court has followed the United States Supreme Court's general rule of retroactivity, applying decisions in criminal cases retroactively except in cases "where retroactive enforcement would cause serious disruption of the administration of justice and where the prior rule was not infected by a serious absence of fundamental fairness." **Cain v. McKinnon**, 552 So.2d 91, 92 n.1 (Miss. 1989) (citations omitted).

¶37. This Court did not expressly state in **Hopson** that the new entrapment guidelines were limited to prospective application. Decisions of this Court should be presumed to have retroactive effect unless otherwise specified. When this Court has held a ruling to apply to cases tried subsequent to an opinion, we have specifically stated that the ruling is prospective in nature. **Willie v. State**, 585 So.

2d 660, 681 (Miss.1991)[1]; **Hatten v. State**, 628 So. 2d 294, 298 (Miss.1993); **Lacy v. State**, 468 So. 2d 63 (Miss.1987); **Scarborough v. State**, 261 So. 2d 475 (Miss.1972); **State v. Hall**, 187 So. 2d 861 (Miss.1966).

¶38. **Hopson** creates a new procedural rule that significantly affects the determination of guilt or innocence in criminal trials and adds greater protection to the rights of criminal defendants. The rule prior to **Hopson** unfairly prohibited use of an otherwise available defense, and retroactive application of the new rule adopted in **Hopson** will not disrupt the administration of justice. Based upon the previous decisions of this Court and the United States Supreme Court, we interpret **Hopson** to apply retroactively. Morgan was therefore entitled to an entrapment instruction and the lower court committed reversible error in refusing to grant the instruction.

### III. WHETHER THE DEFENDANT IS ENTITLED TO A NEW TRIAL AFTER THE UNINDICTED CO-CONSPIRATOR WAS ALLOWED TO TESTIFY THAT HE HAD NOT BEEN GRANTED IMMUNITY FROM PROSECUTION.

¶**39.** Morgan next argues that the trial court erred in overruling his JNOV/New Trial motion after Paul Pittman, the unindicted co-conspirator, was allowed to testify that he had not been granted immunity from prosecution. The State concedes that Pittman had in fact been granted immunity from prosecution. In response to Morgan's assignment of error, the State argues that Morgan is procedurally barred from raising this issue on appeal because he failed to impeach Pittman at trial. Morgan, however, argues that the State had a duty to reveal the perjurious testimony of Pittman.

¶40. Morgan alleges the following testimony constitutes reversible error:

By Felder: Mr. Pittman, you've been given immunity from any prosecution for what you did in this case; is that right?

By Pittman: I don't know what you mean.

By Felder: That man right there has promised you. Mr. Smith has promised you that you won't be prosecuted for testifying in this case; is that right?

By Pittman: No, sir. All I'm doing is telling the truth.

By Felder: Haven't you been told that you have immunity and that you will not be prosecuted in this case?

By Pittman: No, sir.

By Felder: Do you expect to be prosecuted in this case?

By Pittman: I don't know what you mean.

By Felder: Do you know what immunity is?

By Pittman: No, sir.

By Felder: Have you been told that -- by any of the law enforcement officers or anybody in the

District Attorney's office that you will not be prosecuted in this case?

By Pittman: No, sir.

By Felder: Has you lawyer, Mr. Price, told you that you won't be prosecuted in this case?

By Pittman: Only told me I had to tell the truth.

¶41. Following this line of testimony, Morgan did not object, nor did he move the trial court to take curative action. However, Morgan later raised the issue of the immunity agreement in his Motion for JNOV/New Trial.

¶42. In *Esparaza v. State*, 595 So. 2d 418 (Miss.1992), this Court set forth the following standard of review for Motions for JNOV/New Trial:

> The Supreme Court will reverse the lower court's denial of a motion for new trial only if, by denying, the court abused its discretion. *Wetz*, 503 So. 2d at 812. See, e.g., *Crenshaw v. State*, 520 So. 2d 131, 135 (Miss.1988); *Leflorev. State*, 535 So. 2d 68, 70 (Miss.1988); *May*, 460 So. 2d at 781; *Neal v. State*, 451 So. 2d 743, 760 (Miss.1984), *cert. denied*, *Neal v. Mississippi*, 469 U.S. 1098, 105 S.C.. 607, 83 L.Ed.2d 716 (1984).

¶43. In *King v. State*, 363 So. 2d 269 (Miss.1985), this Court held that reversible error occurred when the trial court and the prosecution sat idly by while the State's witness testified that he had not been granted immunity when in fact immunity had been granted months before. In *King*, this Court held that the appellant was not accorded a fair trial commensurate with the constitutional standards of this state or the United States. *Id.* at 274. Specifically the *King* court held:

> A jury always has great responsibility in resolving factual disputes and its responsibility in cases of this nature is awesome. It needs, and the courts must afford, every proper assistance to the jury in its search for the truth. Essential to this effort is knowledge of the inducements likely to affect the witness's credibility so it may be considered by the jury in its deliberations.

*Id.* The Court concluded that ". . . the court had knowledge of the immunity and in our opinion should have responded affirmatively to the motion to disclose rather than leave its discovery to the less certain standard of cross-examination." *Id. King* clearly requires that immunity agreements must be disclosed in order to comport with "constitutional standards of this state or the United States." *Id.*

¶44. In *Barnes v. State*, 460 So. 2d 126, 131 (Miss.1984), this Court held that "leniency/immunity agreement[s] may be presented to the jury where such would tend to impeach or show bias in the testimony of a State's witness." In *Barnes*, the trial court excluded testimony regarding such an agreement. Again, citing the jury's need to hear such testimony in order to evaluate the credibility of witnesses, this Court held that the trial court erred in refusing to allow this line of testimony on the grounds that it was hearsay.

¶45. *Barnes* and *King* clearly indicate the reluctance of this Court to deprive a jury of critical information regarding the credibility of co-conspirators and accomplices. In this case, Pittman was such a witness. Pittman provided critical testimony against Morgan. Pittman's testimony, alone, established the conspiracy between himself and Morgan and provided vital testimony regarding

Morgan's predisposition to purchase marijuana. As in *King*, "the importance of [Pittman's] testimony is obvious and it is also incriminating, but its effect, however material and relevant, could be instantly swept away if the jury believed it to be untrue, the product of purchase rather than material evidence honestly expressed." *King*, 363 So. 2d 269, 274.

¶46. The State argues that Morgan waived this error by failing to impeach Pittman during cross-examination. Specifically, the State argues that Morgan's lawyer had knowledge of the immunity agreement while questioning Pittman, yet failed to raise appropriate objections at that time, but rather waited until after the verdict was reached by the jury. In *Cummins v. State*, 515 So.2d 869, 872 (Miss.1987), this Court held that the failure to offer any objection or jury instruction when the State fails to advise the jury that its witness had been granted immunity for their testimony results in the issue being procedurally barred on appeal.

¶47. Based upon the greater importance of seeking truth and justice, we now overrule that portion of *Cummins v. State*, 515 So.2d 869, 872 (Miss. 1987) which bars appeal of this issue absent a contemporary objection. Instead, we rely on our repeated decisions holding that reversible error results when evidence of an immunity agreement between the State and its key witness is removed from the jury's consideration. *King v. State*, 363 So.2d 269, 274 (Miss. 1978); *Suan v. State*, 511 So.2d 144, 146-48 (Miss. 1987); *Foster v. State*, 508 So.2d 1111, 1112-15 (Miss. 1987); *Malone v. State*, 486 So.2d 367, 367-69 (Miss. 1986); *Fuselier v. State*, 468 So.2d 45, 51-52 (Miss. 1985). This assignment of error also requires reversal of Morgan's conviction and sentence.

### IV. WHETHER THE TRIAL COURT ERRED IN OVERRULING MORGAN'S MOTION TO DISMISS.

¶48. Morgan next alleges that the trial court erred in overruling his motion to dismiss. The basis of Morgan's motion was the allegation that the District Attorney and Assistant District Attorney "attempted to or did intimidate one of the defendant's witnesses during the noon recess." Morgan alleges that a defense witness, Marty Alexander, was approached by the DA and ADA during a noon recess. Alexander testified that Mr. Smith, Assistant District Attorney, called him outside of the B.P. station and asked Alexander about his relationship to the Morgan case. Alexander explained that he told Mr. Smith that he was present when Pittman brought the white Dodge to Morgan's property and witnessed Morgan's interest in the automobile. Alexander then testified that Smith asked if he knew a lawyer and told him that he "needed to get a lawyer for perjury." Alexander stated that the conversation "kind of upset me, caught me off guard."

¶49. Assistant District Attorney Smith testified in response to the defense motion to dismiss. Smith testified that he and Mr. Lampton, District Attorney, recognized Mr. Alexander at the gas station and called him outside to speak with him about his testimony. Smith testified that the prosecution had not yet interviewed Alexander and took this opportunity to do so. Moreover, Smith stated that he and Lampton simply asked that Alexander consider his testimony carefully and make sure that he understood the penalties for perjury.

¶50. Morgan now argues this conversation constituted intimidation and warranted a dismissal of the proceedings against Morgan. However, on cross-examination, Alexander testified that no abusive language or threats were used during the conversation. Alexander also stated that the State did not ask him to testify in any particular manner and conceded that the conversation in no way affected his

testimony.

¶51. The trial court had before it testimony regarding the conversation among Smith, Lampton, and Alexander. After hearing the testimony of Smith and Alexander, the lower court overruled the motion to dismiss. When reviewing factual findings of a trial judge this Court will not overturn a finding of fact unless it is clearly erroneous or the trial court applies incorrect legal standards. *See Lesley v. State*, 606 So. 2d 1084 (Miss.1992). In the instant case, Morgan alleges that the conversation which occurred constituted intimidation. However, Morgan's argument is undermined by Alexander's testimony that no abusive language or threats were used. Moreover, Alexander concedes that the conversation did not affect his testimony on behalf of Morgan.

¶52. In *Thomas v. State*, 247 Miss. 704, 712, 159 So. 2d 77, 80 (1963) this Court held:

> [I]n reviewing a conviction of a crime, any doubts should be resolved in favor of the integrity, competence and proper performance of the official duties of the judge and prosecuting attorney, and that this Court should give effect to all reasonable presumptions in favor of the rulings of the court below.

¶53. Having reviewed the evidence, this Court does not find that the decision of the trial court to overrule the motion to dismiss on the grounds of prosecutorial misconduct was clearly erroneous. This issue is without merit.

## CONCLUSION

¶54. Although Morgan claims he was entrapped as a matter of law, the facts of the instant case are distinguishable from those present in *Barnes v. State*, 493 So. 2d 313 (Miss.1986) and *Kemp v. State*, 518 So. 2d 625 (Miss.1988) and therefore, the trial court did not err in overruling the defense motion for a directed verdict. However, the trial court's refusal to to instruct the jury on the entrapment defense was error in view of this Court's decision in *Hopson*. We also hold that reversible error results when evidence of an immunity agreement between the State and its key witness is kept from the jury. The record, however, does not reveal that the trial court erred in overruling the motion to dismiss. Accordingly, we affirm in part and reverse and remand to the trial court for a new trial.

**¶55. AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**PRATHER AND SULLIVAN, P.JJ., PITTMAN, BANKS, ROBERTS AND MILLS, JJ. CONCUR. LEE, C.J., AND McRAE, J., CONCUR IN RESULT ONLY.**

1. This Court has repeatedly recognized the prospective nature of the *Willie* decision. See *Davis v. State*, 660 So. 2d 1228 (Miss.1995); *Carr v. State*, 655 So. 2d 824 (Miss.1995); *Mack v. State*, 650 So. 2d 1289 (Miss.1994); *Chase v. State*, 645 So. 2d 829 (Miss.1994); *Foster v. State*, 639 So. 2d 1263 (Miss.1994).