740 So.2d 952 (1999)
Dale HOLMES a/k/a Dale Wayne Holmes, Appellant,
v.
STATE of Mississippi, Appellee.
No. 97-KA-00640-COA.
Court of Appeals of Mississippi.
June 8, 1999.
*953 Derek L. Hall, Jeanine M. Carafello, Jackson, Attorneys for Appellant.
Office of the Attorney General by Dewitt T. Allred III, Attorney for Appellee.
BEFORE McMILLIN, C.J., COLEMAN, AND PAYNE, JJ.
COLEMAN, J., for the Court:
¶ 1. A grand jury in Lauderdale County indicted the appellant, Dale Holmes, for driving under the influence (third offense). In compliance with Rule 11.03 of the Uniform Circuit and County Court Rules, the trial court bifurcated Holmes's trial on the principal charge of driving under the influence and on the charge of previous convictions. Pursuant to the jury's finding him "guilty of driving under the influence," the trial court conducted a separate trial the next day on the "charge of previous convictions [of two misdemeanor DUI's]" and entered its judgment of conviction of "felony driving under the influence." However, the trial court deferred sentencing Holmes to allow a parole officer to prepare a presentencing investigation. After it had concluded its sentencing hearing, the trial court sentenced Holmes "to serve a term of five (5) years in the custody of the Mississippi Department of Corrections with three (3) years and six (6) months of such sentence suspended and one (1) year and six (6) months to serve and also to five (5) years reporting probation under the supervision of the Mississippi Department of Corrections." After the trial court denied *954 Holmes's motion for a new trial, Holmes appealed from that court's judgment of conviction and its sentencing and probation order. Holmes presents the following six issues, quoted verbatim from his statement of issues required by Mississippi Rule of Appellate Procedure 28(a)(3), for this Court's analysis and resolution:
1. Did the trial court commit reversible error by allowing a police officer to render expert opinion testimony regarding the administration of certain field sobriety tests?
2. Did the trial court commit reversible error by failing to suppress the testimony and videotape evidence concerning Mr. Holmes'[s] performance on certain ... field sobriety tests considered invalid if administered to persons fifty pounds overweight?
3. Did the trial court commit reversible error by failing to suppress the testimony concerning the administration of the horizontal gaze nystagmus test?
4. Did improper comments by the prosecution during closing argument amount to reversible error?
5. Did the trial court commit reversible error by permitting a previous uncounseled misdemeanor DUI conviction to be considered for enhancement purposes in the sentencing phase?
6. Did the prosecution of this criminal action[] amount to a second punishment for the same offense for which the defendant had already been punished, thus in violation of the Double Jeopardy Clause of the Fifth Amendment?
Young v. City of Brookhaven, 693 So.2d 1355 (Miss.1997), which was decided after this case was tried in the circuit court but which held that the horizontal gaze nystagmus (HGN) test could only be used as a basis for probable cause to require the detainee to submit to a breath test, requires that this Court hold that the trial court erred when it "fail[ed] to suppress the testimony concerning the administration of the [HGN] test." Because we remand this case for a new trial, we also resolved Holmes's fifth and sixth issues.

I. Facts
¶ 2. As Meridian policeman R.L. Thomas drove his police cruiser into the parking lot of a Shell service station located on Highway 39 North in Meridian around midnight on the night of October 7-8, 1995, a male customer emerged from the service station and spoke to Officer Thomas and Officer Troy Smith, who was riding in the front passenger's seat with Officer Thomas. Officer Smith exited the cruiser and entered the service station to investigate the information which the male customer had conveyed to them. While Officer Smith entered the service station, Officer Thomas drove behind and around the service station and parked the police cruiser near the corner of the building. As Officer Thomas prepared to join Officer Smith inside the service station, Officer Smith emerged from the service station and identified Holmes, who was also leaving the service station, as the man who had been the subject of the male customer's information.
¶ 3. Holmes entered his pickup truck, in which there was one passenger, and drove off the service station parking lot across Highway 39 Bypass. Holmes then began driving his truck west on North Frontage Road. Officers Thomas and Smith pursued Holmes with the blue lights of their police cruiser flashing. Holmes had driven less than a quarter of a mile from the Shell service station when he stopped his truck in a motel parking lot in response to the flashing blue lights. Officer Thomas approached Holmes as he sat in his truck and explained to Holmes that he, Officer Thomas, had stopped him because a customer emerging from the Shell service station had reported to Officer Thomas that Holmes was "being obscene in the store."
¶ 4. Officer Thomas noted "the odor of alcohol coming off of [Holmes's] breath," and he observed that Holmes "had bloodshot eyes." According to Officer Thomas, Holmes's "pupils were very dilated." Because *955 of these observations and because Officer Thomas considered Holmes's talking to be "aggressive," he summoned Meridian's DUI police officer, J.G. Crain. Holmes did not exit his truck while Officer Thomas was at the scene. As soon as DUI Officer Crain arrived, Officer Thomas "advised [Officer Crain] why the subject [Holmes] had been stopped." Officers Thomas and Smith then immediately left the scene because Officer Thomas had received another call. Officer Crain returned to his police car and turned on a compact VHS camcorder mounted on the car's dashboard to record his encounter with Holmes. Officer Crain also wore a microphone in his pocket so that the audio of his conversation with Holmes might be recorded "while we [were] giving the field tests."
¶ 5. Officer Crain observed that Holmes had "slurred speech" and that Holmes's eyes "were dilated, bloodshot." When Holmes spoke to Officer Crain, Crain "detect[ed] an intoxicating beverage coming from him." After Holmes got out of his truck as Officer Crain had requested, the DUI officer noticed that Holmes "appeared to be a little unsteady on his feet." Officer Crain then administered the HGN test on Holmes and "received six distinct clues out of his eyes." The [HGN] test is but one of three field tests which Officer Crain administered to drivers whom he suspected of driving under the influence. The other two field tests were "the walk and turn test and the one-leg stand test," but Officer Crain did not administer these latter two field tests because Holmes told Officer Crain that he "had something wrong with his knees," which explanation Officer Crain accepted.
¶ 6. Because Officer Crain "received six distinct clues out of [Holmes's] eyes" from his administration of the HGN test, he escorted Holmes to the headquarters of the Meridian Police Department to administer "the intoxilizer [breath] test." However, Holmes declined to submit to the test. From these events, Holmes's indictment ensued.

II. Analysis and resolution of the issues

A. Holmes's third issue
¶ 7. For his third issue Holmes asks whether "the trial court commit[ted] reversible error by failing to suppress the testimony concerning the administration of the [HGN] test?" More than two months before this case was tried, the trial court heard Holmes's motion to suppress DUI Officer Crain's testimony about his having administered the HGN test to Holmes because the HGN test had not "been accepted for the purpose in which [it was] designed." About the HGN test, the trial judge opined and then held as follows:
It would be my opinion at least preliminarily that absent some testimony by the State that that test [HGN] is reliable, is generally accepted by the scientific community as being a valid test to indicate that a human being is under the influence of alcoholic beverage, without some type of predicate or foundation that the officer should not be able to testify to the jury that that test [HGN] is indicative of a human being's consumption of alcoholic beverage.
The trial judge continued that the officer could "testify as to what he did and what he performed on site but that allowing that officer to state or give an opinion that [the HGN test] is in someway a valid test to judge a human being's state of intoxication, I think is erroneous without the proper predicate being laid."
¶ 8. Notwithstanding the trial judge's apparently granting Holmes's motion to suppress Officer Crain's testimony about his administration of the HGN test to Holmes, the record reflects the following direct examination of Officer Crain by the State:
Q. Okay. Whatdid you attempt to do that night when you stopped, stopped Mr. Holmes and asked him to exit his pickup truck?

*956 A. I attempted to put the subject through the three standardized field sobriety tests.
Q. Okay. What are those tests, please, Sir?
A. The first test is horizontal gaze nystagmus test.
Q. Now without telling me, Officer Crain, what kind of conclusions you drew or what the results of the tests are, can you tell me what the horizontal gaze nystagmus test is?
A. When the body is under the influence of an intoxicating beverage, the eyes have an involuntary jerking motion to them. The subject doesn't know that their eyes are jerking. You caneverybody has nystagmus, but you can't see it with the naked eye. Alcohol enhances the effect where you can. Just look forfor the involuntary jerking in the eyes.
Q. Is that what nystagmus is?
A. Yes, Sir. That is the basic definition of nystagmus.
Q. Did you administer that test?
A. Yes, I did.
. . . .
Q. Again, now I'm not asking you about any conclusions that you drew from the field tests that you took or that you administered, but as a result of your observations of him [Holmes] that you just told us about and as a result of the field tests that you gave him, what steps did you take with this driver?
A. Well, Sir, I performed the horizontal gaze nystagmus test on him [Holmes] and received six distinct clues out of his eyes.
¶ 9. The State concluded its direct examination of DUI Officer Crain as follows:
Q. Are you trained to make a determination about whether a person is driving under the influence?
A. Yes, Sir.
Q. And did you make such a determination in this case?
A. Yes, Sir, I did.
Q. And what did you decide?
A. That the subject was operating under the influence.
Q. Sir?
A. That he was operating under the influence.
¶ 10. Notwithstanding the supreme court's rendering its decision after this case was tried, Young v. City of Brookhaven, 693 So.2d 1355, 1360-61 (Miss.1997), is the basis for our resolution of Holmes's third issue favorably to him. In Young, the Mississippi Supreme Court provided the following evaluation of the use of the HGN test to determine whether a driver might be under the influence of alcohol:
We find that the HGN test is a scientific test. The potential of a juror placing undue weight upon testimony about the administration of the test is high. Whereas most other field sobriety tests arise out of a juror's common experiences, i.e., one stumbles, slurs words, and staggers when drunk, the HGN test relies upon a scientifically or at least professionally relevant set of observations.
Therefore, this Court finds that the HGN test is not generally accepted within the scientific community and cannot be used as scientific evidence to prove intoxication or as a mere showing of impairment.
However, the HGN test can still be used to prove probable cause to arrest and administer the intoxilizer or blood test. This is the only allowable use for the test results....
We deliver a stern warning concerning using the HGN test for reasons other than to establish probable cause. The State cannot use the results of the HGN test merely as an indicator to show that the defendant was "under the influence of intoxicating liquor" to prove the requisite elements of Miss.Code *957 Ann. § 63-11-30(1)(a). Furthermore, the State cannot attempt to introduce the HGN test as scientific evidence to show degree of intoxication.
Young, 693 So.2d at 1360-61.
¶ 11. The State dismisses Young with its assertion that "since Young had not been decided [when the case sub judice was tried], there was no Young `error'." However, this Court finds that Morgan v. State, 703 So.2d 832 (Miss.1997) disposes of the State's argument. At issue in Morgan was whether the trial court had erred in refusing to grant an instruction on entrapment. Morgan, 703 So.2d at 839. When Morgan was tried on charges of conspiracy to possess more than one kilogram of marijuana and unlawful possession of more than one kilogram of marijuana, the Mississippi Supreme Court had not yet rendered its opinion in Hopson v. State, 625 So.2d 395 (Miss.1993). In Hopson, the Mississippi Supreme Court "adopted Mathews v. United States, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988), wherein the United States Supreme Court held that a defendant may assert an entrapment defense although he denie[d] committing one or more elements of the crime. Hopson, 625 So.2d at 399-401." Morgan, 703 So.2d at 839.
¶ 12. Even though Hopson had been decided after Morgan was tried, the Mississippi Supreme Court held that "Morgan was entitled to an entrapment instruction and the lower court committed reversible error in refusing to grant the instruction." Morgan, 703 So.2d at 839. The Mississippi Supreme Court explained:
"As a rule, judicial decisions apply `retroactively.' Indeed, a legal system based on precedent has a built-in presumption of retroactivity." Solem v. Stumes, 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 ... (1984) (citation omitted). The United States Supreme Court has on several occasions held that new decisions that affect the process of determining guilt or innocence and which could well lead to acquittal should be given retroactive effect.
Id. The Mississippi Supreme Court added, "Decisions of this Court should be presumed to have retroactive effect unless otherwise specified." Id.
¶ 13. Morgan requires that this Court apply Young to Holmes's third issue in the case sub judice. Nevertheless, even though the Mississippi Supreme Court delivered its "stern warning" that "[t]he State cannot use the results of the HGN test merely as an indicator to show that the defendant was `under the influence of intoxicating liquor' to prove the requisite elements of [Section] 63-11-30(1)(a)," the supreme court affirmed Young's conviction of driving while intoxicated. Young, 693 So.2d at 1362. Young's conviction of driving while intoxicated was affirmed because the supreme court found the error of introducing the result of the HGN test to be harmless "due to the overwhelming evidence presented by the State to prove the intoxication of Young...." Id. In Young, the appellant testified that before he had been arrested at approximately 10:00 p.m., he had drunk "between six and eight twelve ounce beers...." Young, 693 So.2d at 1356. The officer who stopped Young had observed him straddle the westbound lanes of a street in Brookhaven, after which the officer stopped Young. Id. Young "returned a blood alcohol content of.285" when he "was administered a breath test on an intoxilizer." Id. This evidence of Young's guilt was overwhelming.
¶ 14. Young suggests that it is appropriate for this Court to review the State's evidence that Holmes was "under the influence of intoxicating liquor" as he drove his pickup truck to determine if that evidence was overwhelming of Holmes's guilt. We begin this review by quoting the following cross-examination of Officer R.L. Thomas, who observed Holmes exit the Shell service station and who stopped the pickup truck in which Holmes drove away from the service station:

*958 Q. All right. And there was nothing about the way [Holmes] walked from the store to his car [sic] that gave you any idea that he was alcoholically impaired or under the influence, was it?
A. At that time, no.
Q. And there was nothing about the way he got in that vehicle that gave you any idea that he suffered from any alcohol impairment or was under the influence, did he?
A. At that time, no.
Q. And there was nothing about the way he started his car and pulled off the parking lot driving that gave you any idea that he was under the influence, was it?
A. Excuse me. At that time, no.
Q. No. And there was nothing about the way he pulled across five lanes of traffic and onto this lane that gave you any indication that he was driving under the influence, did he? Nothing about the way he operated that vehicle?
A. At that point in time, no.
Q. No. And at the time he pulled across here, he obeyed the traffic control device, whatever that was, didn't he?
A. It was a flashing signal.
Q. Yeah. So he slowed down and went across the way he was supposed to?
A. He kind of like went across it from the lot.
Q. Sure. And at the time, he did not speed. He obeyed speed limits, didn't he?
A. He didn't speed.
Q. And when he came across there at this double yellow line until he pulled in, he stayed in his lane of traffic, didn't he?
A. Until the time he pulled up on the parking lot, yeah, he stayed in his lane of traffic.
Q. Stayed in his lane of traffic. So from the time you first observed him until the time he pulled over, he had broken no law that you could see happening in your presence?
A. No. At that time, no.
¶ 15. On direct examination by the assistant district attorney, Officer Thomas testified that he "got the odor of alcohol coming off [Holmes's] breath" as he informed Holmes about the reason he had stopped him. Thomas further testified that Holmes "appeared to be intoxicated" and that "[h]e had bloodshot eyes." Thomas explained "certain clues we look for" when he was "trying to determine if [a] person is under the influence." Among the clues provided by Holmes was Holmes's "aggressive talking," Holmes's "very dilated" pupils, and the odor of alcohol which emanated from Holmes's breath. Interestingly, when the assistant district attorney asked Officer Thomas if he had asked Holmes whether he had been drinking, the officer replied that he had asked Holmes that question but that he, Officer Thomas, could not "quite remember" Holmes's answer. Holmes remained seated in his truck throughout Officer Thomas's presence at the scene. Thomas testified that he summoned DUI Officer Crain "[b]ecause of the odor of alcohol and the dilated pupils." As soon as Officer Crain arrived, Officer Thomas related to him the circumstances of his stopping Holmes and then promptly left the scene to answer another call.
¶ 16. DUI Officer Crain testified that he turned on the VCR camcorder located on the dashboard of his police car before he began to interrogate Holmes. Officer Crain observed that Holmes "had slurred speech," that "[h]is eyes were dilated, bloodshot," and Officer Crain then testified that "[w]hen [Holmes] spoke to me, I could detect an intoxicating beverage coming from him." Officer Crain then testified as we earlier quoted from the record about his administration of the HGN test to Holmes and his receiving "six clues" from *959 the administration of that test. Officer Crain explained that he did not administer the "walk and turn" and the "one legged stand" field tests because Holmes told him that "he had something wrong with his knees." Crain "believe[d Holmes] tried to pull his pants leg and show [Officer Crain] his knees...." However, Crain "told [Holmes] that [he] would take his word for it." Although Officer Crain did not administer these remaining two field tests, he scored Holmes as failing both of them because he did not believe Holmes's explanation that something was wrong with his knees.
¶ 17. Officer Crain escorted Holmes to the Meridian Police Department, where Holmes declined to submit to a breath test on the intoxilizer. Under cross-examination, Officer Crain acknowledged that Holmes had asked for a blood test, but, according to Officer Crain's testimony, the Meridian police chief had established a policy by way of a written memorandum that prevented Officer Crain from complying with Holmes's request to receive an independent blood test.[1]
¶ 18. The record reflects the following conclusion of the State's direct examination of Officer Crain:
Q. Are you trained to make a determination about whether a person is driving under the influence?
A. Yes, Sir.
Q. And did you make such a determination in this case?
A. Yes, Sir, I did.
Q. And what did you decide?
A. That the subject was operating under the influence.
Q. Sir?
A. That he was operating under the influence.
¶ 19. This Court has burdened its opinion with this perhaps too tedious review of the State's evidence to determine whether, as in Young, the State's evidence that Holmes was operating his truck "under the influence of intoxicating liquor" was so overwhelming of Holmes's guilt that the trial court's allowing DUI Officer Crain to testify about his administration of the HGN test to Holmes over Holmes's objection was harmless error. From our review of the State's evidence, we conclude that the most damning evidence was Officer Crain's opinion that Holmes was "operating under the influence." We cannot discern from Officer Crain's testimony the extent to which he relied on the six clues he received from his administration of the HGN test to Holmes for his conclusion that Holmes was "operating under the influence." Officer Crain did not administer the other two field tests, and the other indicia of Holmes's inebriation to which both Officer Thomas and Officer Crain testified, i.e., bloodshot eyes, dilated pupils, slurred speech, and "aggressive talking" are ambiguous, especially in light of Officer Thomas's concession under cross-examination that he had no basis on which to conclude that Holmes was "under the influence" or to charge Holmes with having violated any law until after Holmes drove into a parking lot located no more than one-quarter mile from the Shell service station, where he stopped.
¶ 20. Therefore, pursuant to its review of the State's evidence that Holmes was "operating [his truck] under the influence," this Court cannot evaluate the State's evidence of Holmes's guilt as being so overwhelming *960 that allowing DUI Officer Crain to testify about his administration of the HGN test on Holmes and his receiving six clues from its application was harmless error. Thus, consistent with Young and Morgan, we hold that notwithstanding his initial ruling on Holmes's motion to suppress Officer Crain's testimony about the HGN test, the trial judge erred by allowing this testimony, and we accordingly reverse and remand this case. The nature of Holmes's fifth and sixth issues require that we address them for the trial court's further reference on remand.

B. Holmes's fifth issue
¶ 21. In his fifth issue, Holmes asks whether "the trial court commit[ted] reversible error by permitting a previous uncounseled misdemeanor DUI conviction to be considered for enhancement purposes in the sentencing phase?" The "previous uncounseled misdemeanor DUI conviction" about which Holmes complains occurred in the Justice Court of Madison County. In his brief, Holmes attacks the validity of this conviction on the following grounds:
First, the abstract [of court record] contained no date of conviction in the allocated section labeled "court date." Second, although there was no reference on the face of the abstract as to whether the defendant waived his right to counsel, a Madison County Justice Court "Waiver of rights and entry of guilty plea" for cause no. 91-578, which was signed by the defendant [Holmes], was introduced by the State as the purported waiver to accompany the aforesaid abstract.... Third, there was no reference on the face of the abstract as to whether or not the defendant was sentenced to any jail time.

1. Applicable law
¶ 22. There are two facets to Holmes's objections to the Madison County Justice Court conviction. The first facet encompasses Holmes's first and third objections, in which he attacks what he maintains are significant omissions in the abstract of the court record of his conviction, i.e., no date of conviction and no recitation of Holmes's sentence. The second facet deals with whether Holmes waived his right to representation by counsel in the Madison County Justice Court. Sheffield v. City of Pass Christian, 556 So.2d 1052 (Miss.1990) determines our resolution of the first facet, and both Sheffield and Ghoston v. State, 645 So.2d 936 (Miss.1994) determine our resolution of the second facet.

2. Omissions in the abstract of the record
¶ 23. In Sheffield, the Mississippi Supreme Court established the procedures for admitting prior misdemeanor convictions to enhance subsequent sentences:
The presumption of regularity of judgment shall be sufficient to meet the original burden of proof. After the judgments of conviction are introduced, the burden shifts to the defendant to show any infringement of his rights or irregularity of procedure upon which he relies.... If the defendant presents evidence, through his testimony or other affirmative evidence, which refutes the presumption of regularity, the burden falls to the Commonwealth to prove that the underlying judgments were entered in a manner which did, in fact, protect the rights of the defendant. A silent record simply will not suffice.
Sheffield, 556 So.2d at 1053 (quoting Ratliff v. Commonwealth, 719 S.W.2d 445, 451 (Ky.Ct.App.1986)).
¶ 24. As required by the third paragraph of Rule 11.03 of the Uniform Circuit and County Court Rules, the trial court conducted a hearing without a jury on Holmes's previous convictions of driving under the influence on the day after the jury returned its verdict of guilty. Without objection from Holmes's counsel, on the State's motion, the court admitted into evidence certified abstracts of Holmes's convictions of driving under the influence *961 in both the Madison County Justice Court and the Municipal Court of Flowood. Also without objection from Holmes's counsel, the trial court admitted into evidence a copy of Holmes's waiver of counsel which he signed and was filed in the Justice Court of Madison County. The State further moved to admit into evidence a certified copy of the page from the docket of the Madison County Justice Court which reflected that Dale Wayne Holmes had been convicted of "D.U.I.2nd offense" on January 24, 1991. Without objection from Holmes, the trial court admitted this certified copy of the docket page into evidence. The case number and other information contained in both the abstract of court record and the certified copy of the docket page match.
¶ 25. Our application of the Sheffield procedure for admitting prior misdemeanor convictions to enhance subsequent sentences which we previously quoted results in our conclusion that the trial court did not err when it found that Holmes had twice before been convicted of driving under the influence. Even if this Court deemed Holmes's two objections to the omission of the date of conviction and the sentence imposed sufficient to rebut the presumption of the "regularity of [this] judgment," this Court would also opine that the State discharged its burden "to prove that the underlying [Madison County Justice Court] judgment" was properly entered.

3. Uncounseled conviction
¶ 26. Holmes testified at the hearing on the previous convictions. He acknowledged that the signature which appeared beneath the waiver of rights and entry of guilty plea dated January 24, 1991 and filed in the Madison County Justice Court was his. However, Holmes remembered "signing something whenever they set me up a payment plan at the courthouse." He explained that when they were setting up his payment plan, they "just throwed [sic] it [the waiver] and said sign and I signed." Regardless of whether Holmes's waiver was knowingly, willingly, and intelligently executed, this Court notes that the certified page from the Madison County Justice Court reflects that Holmes's sentence to serve "48 hrs. in MCJ" was suspended. Thus, Holmes was never incarcerated as the result of his DUI conviction in the Madison County Justice Court.
¶ 27. Ghoston v. State conclusively resolves the "uncounseled conviction" aspect of Holmes's fifth issue against him. In Ghoston, the appellant had been convicted of felony DUI based upon three prior DUI misdemeanor convictions. Ghoston, 645 So.2d at 937. However, while Ghoston had not been represented by counsel on any of these three previous charges, Ghoston was never sentenced to serve time in jail on any of those convictions. Relying on Nichols v. United States, 511 U.S. 738, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994), the Mississippi Supreme Court held that Ghoston's three previous misdemeanor DUI convictions could be used to enhance his punishment. Ghoston, 645 So.2d at 938. In Nichols, the United States Supreme Court had held "that previous uncounseled misdemeanor convictions may be considered in sentencing a defendant for a subsequent offense so long as the previous uncounseled misdemeanor conviction did not result in a sentence of imprisonment." Ghoston, 645 So.2d at 938. Because Holmes received no sentence of imprisonment for his DUI conviction in the Madison County Justice Court, that uncounseled conviction could be used to enhance his punishment in the case sub judice.

4. Summary of Holmes's fifth issue
¶ 28. The State introduced sufficient documentation of Holmes's DUI conviction in the Madison County Justice Court to invoke "the presumption of regularity of judgment" which Sheffield holds is "sufficient to meet the original burden of proof." See Sheffield, 556 So.2d at 1053. The State's introduction of the certified copy of *962 the justice court docket page which provided the information missing in the abstract of court record was sufficient to meet the State's burden of overcoming Holmes's objections to those deficiencies. Because Holmes received no sentence of incarceration (the forty-eight hour sentence was suspended), his conviction, even if uncounseled, was admissible to enhance his sentence as a convict of "felony DUI."

C. Holmes's sixth issue
¶ 29. Holmes's sixth issue attacks his conviction because it "amounted to double jeopardy." However, in Keyes v. State, 708 So.2d 540, 548 (Miss.1998), the Mississippi Supreme Court held "that the Double Jeopardy Clauses of the United States and Mississippi Constitutions do not preclude criminal prosecution for violation of Miss.Code Ann. § 63-11-30 subsequent to administrative license suspension pursuant to § 63-11-23(2)." Keyes resolves Holmes's sixth issue adversely to him.
¶ 30. THE JUDGMENT OF THE LAUDERDALE COUNTY CIRCUIT COURT OF APPELLANT'S CONVICTION OF FELONY DRIVING UNDER THE INFLUENCE IS REVERSED AND REMANDED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LAUDERDALE COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, AND DIAZ, JJ., CONCUR.
PAYNE, J., DISSENTS WITH SEPARATE WRITTEN OPINION.
IRVING, LEE, AND THOMAS, JJ., NOT PARTICIPATING.
PAYNE, J., dissenting:
¶ 31. I respectfully dissent to the majority's analysis of issue III. In my opinion, the use of the horizontal gaze nystagmus test, better known as the HGN test, does not per se, mandate reversal of a conviction when "overwhelming evidence presented by the State" proves intoxication. Young v. City of Brookhaven, 693 So.2d 1355, 1361-62 (Miss.1997).
¶ 32. As the majority correctly sets forth, the Mississippi Supreme Court delivered a "stern warning" in Young that "[t]he State cannot use the results of the HGN test merely as an indicator to show that the defendant was `under the influence of intoxicating liquor' to prove the requisite elements of Section 63-11-30(1)(a)." However, according to the majority's analysis, the fact that the HGN was mentioned rules out other forms of evidence which point guilt in Holmes's direction. While I can not "explain away" the use of the HGN test as it is clear that the test may not be employed to denote inebriation, I do state, as in Young, that there is other evidence of Holmes intoxication which is sufficient to present to the jury for resolution of this matter. See Young, 693 So.2d at 1361-62.
¶ 33. As the record indicates, and as the majority concedes, Officer Crain observed Holmes slurred speech, dilated and bloodshot eyes and detected an "intoxicating beverage coming from him." Officer R.L. Thomas noticed the "odor of alcohol coming off [Holmes's] breath." Thomas further testified that Holmes "appeared to be intoxicated" and that "[h]e had bloodshot eyes." This evidence is sufficient proof, in the eyes of the Young court, to affirm conviction of this crime.
¶ 34. From the testimony presented regarding the HGN test, the jury could gather that Holmes's performance on this specific test indicated simply that he had consumed some liquor, not that he was under the influence of alcohol. Notwithstanding the fact that the HGN test was discussed before the jury, it was independently established from the two officers' testimony that Homes's breath smelled of alcohol.
¶ 35. Stating as much, I find that reversal on this point is inappropriate as no abuse of discretion occurred with the admittance of this testimony. Holmes was *963 not prejudiced, and the admission of HGN testing was harmless.
NOTES
[1] Section 63-11-13 provides for such a test. It reads:

The person tested may, at his own expense, have a physician, registered nurse, clinical laboratory technologist or clinical laboratory technician or any other qualified person of his choosing administer a test, approved by the state crime laboratory created pursuant to section 45-1-17, in addition to any other test, for the purpose of determining the amount of alcohol in his blood at the time alleged as shown by chemical analysis of his blood, breath or urine. The failure or inability to obtain an additional test by such arrested person shall not preclude the admissibility in evidence of the test taken at the direction of a law enforcement officer.
Miss.Code Ann. § 63-11-13 (Rev.1996).