363 So.2d 269 (1978)
Mary Joy KING
v.
STATE of Mississippi.
No. 50632.
Supreme Court of Mississippi.
September 27, 1978.
As Corrected on Denial of Rehearing November 1, 1978.
*270 Sullivan, Smith, Hunt & Vickery, Ralph E. Chapman, Charles L. Sullivan, Clarksdale, for appellant.
A.F. Summer, Atty. Gen. by Billy L. Gore, Special Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, WALKER and BOWLING, JJ.
PATTERSON, Chief Justice, for the Court:
Mary Joy King appeals from a conviction of murder and sentence to life imprisonment by the Circuit Court of Clay County.
Mary Joy was the wife of Bruce King, Jr., and resided with him and their three children in the city of Oxford. On the night of November 30, 1976, Bruce King, Jr. was shot and killed in his residence. Mary Joy King, Bess Beane, Martha Sue Elmer, Richard Romanus and Frederick Williams were indicted for the murder. The appellant's trial was removed from Lafayette to Clay County on motion for a change of venue. By the time this trial began, Martha Sue Elmer had been convicted of the murder, Bess Beane had pled guilty to it, with sentence deferred in each case, and neither Richard Romanus nor Frederick Williams had been tried.
The evidence for the state informs of a conspiracy among the indictees to kill King. Some detail is necessary to the evaluation of the errors assigned.
Elmer testified that she had been acquainted with Mary Joy King for several years and visited with her daily for part of this time. Beginning about two years previously the appellant expressed dissatisfaction with her husband and asked her assistance in finding someone to kill him. In explanation, the appellant told her that she could not receive adequate financial settlement through a divorce to support herself and the children. Thereafter they frequently discussed the suggested crime.
Subsequently Elmer contacted Richard Romanus and accompanied him on an automobile trip to New York from which they returned with Frederick (Fritz) Williams. Later, November 1976, she met with the appellant and Romanus in Shirley Jolley's mobile home where the plans to kill King were discussed. When Romanus offered to commit the crime, the appellant devised a scheme whereby Romanus would call King, who operated a Firestone store, and tell him that his car battery had failed and when he came to the store to supply a new battery, Romanus would shoot him. Elmer provided Romanus with a gun for this purpose and he and Williams drove to Oxford on November 29 and called King in furtherance of their objective. The plan failed because King would not leave his residence to assist in obtaining a new battery.
The following day Elmer and Bess Beane, who were sisters, had lunch with the appellant and plotted for the slaying to be that night. The appellant proposed, according to Elmer, corroborated by Beane, and it was agreed that appellant would attend a ball game that evening with her children, but would make certain the garage door of her home was left unlocked. Frederick Williams would then enter the residence *271 through the unlocked door where he would await his victim, who was also to attend the ball game but in another vehicle. The plan progressed as proposed, according to Elmer. Beane drove Williams to the King residence, departed and shortly returned for him, ultimately leaving Williams in a bus station in an adjacent city.
On cross-examination, Elmer testified concerning the possibility of her receiving a lighter sentence as suggested by her attorney, Mr. Pagels, of Memphis, Tennessee.
Q. I believe he is the one represented you in the trial at Oxford?
A. Yes, sir.
Q. Did you discuss anything with him concerning what sentence might be imposed upon you in return for your testimony?
A. He, he suggested that the State might recommend a lesser sentence, maybe 20 years.
Q. Did he also tell you that was not binding on the Court?
A. Yes sir.
Elmer admitted she was lying in her previous testimony wherein she stated that Mrs. King had not met Romanus.
Romanus gave evidence for the state. He corroborated Elmer's testimony that they had gone to New York and returned with Frederick Williams. He knew Mary Joy King, having met her the second week in November in Shirley Jolley's trailer in Southaven, Mississippi. He responded to questions about their relationship as follows:
Q. What did she tell you?
A. She told me that she could trust me, she was under the understanding that she could trust me, and that she had a plan or layout to kill Mr. King, Bruce King, and that she gave me the whole planned layout as to what was to take place to make it look like a robbery.
Q. What did she give you, sir?
A. Well, on the back of a piece of paper she sketched out the garage that Mr. King owned and told me to go to Oxford and pose as a student, roughly around seven at night or 7:30 and call him and tell him that my battery had gone in my car, and that he would open the station up and he would drive a pickup truck, to follow him through the office, through the garage area into a little office where there was a desk and into the battery room and that's where to shoot him.
* * * * * *
And:
A. Fritz Williams and myself drove to Mrs. Shirley Jolley's trailer in Southaven and picked up a Chevy, I don't know whose car it was, a Chevy that was there with the gun under the seat and a note, and we drove to just outside Oxford, Mississippi, it was roughly around 7:00 o'clock, and called Mr. King, spoke with him, got back in the car, drove to another pay phone and called Mrs. Beane in Southaven, and told her that Mr. King wouldn't come out, and drove back to Memphis.
On cross-examination, Romanus acknowledged that he had testified in Elmer's trial but he did not make the statements appertaining to Mrs. King as in this trial. When asked about immunity, he responded:
Q. And in addition to that you have entered into some agreements or made some what we call deal as to what's going to happen to you, isn't that correct?
A. I have made no deal, sir.
Q. You have not had any understanding of any nature whatsoever as to what we may expect to be the ultimate to happen to you?
A. No, I haven't sir.
Q. That has not occurred?
A. No, it has not.
Q. Has it been discussed?
A. No, it has not.
Q. Has it been discussed to your knowledge by your attorney?
A. Possibly.
Q. Do you know what conclusions your attorney may have reached in your behalf?
A. No, I do not, just what he has told me.
*272 By his testimony, Romanus participated in the murder conspiracy because the appellant told him he would be taken care of after she got the insurance money.
Bess Beane was offered as a state's witness. She acknowledged pleading guilty to the murder of Bruce King, Jr. but maintained she remained a friend of the appellant. She testified the appellant wanted her husband killed because she detested him and a divorce would not leave enough to support her and the children. She related the attempt of Romanus and Williams to kill Bruce King the night of November 29 and the plans discussed at lunch the following day. In the accomplishment of this she drove Frederick Williams to the King's residence on the night of November 30 and departed for some thirty minutes before returning. When she did so, Williams was waiting outside of the house with the weapon and a money bag. She then drove him to her home in Tupelo where the weapon was left and to the bus station where he departed with the money.
When asked whether the state might make a recommendation in her behalf for her testimony, she responded, "Well, my attorney said that it might be 20 years." On cross-examination, after testifying the state had not offered any recommendation for her, she elaborated as follows:
Q. And it's also a fact that you were lead (sic) to believe that a 20 year sentence may be imposed and that you would perhaps only have to serve three or four years and would get to go home on weekends, perhaps on leaves; isn't that a fact?
A. Well, my attorney said something to this effect; but the state has never.
Q. I understand that. You told Mr. Coleman the state never made you an agreement and this is still your testimony?
A. Yes sir.
* * * * * *
Q. But Mr. Pagels lead (sic) you to believe if you cooperated as a matter of fact, more precisely, if you helped to make a case against Mrs. King you might be out in three and a half or four years?
A. No, sir.
Q. Was the figure three and a half or four years?
A. When Mr. Pagels said, he said I think you would be better off to cooperate with the state because you are going to be convicted anyway.
* * * * * *
Q. But again, could we get back to you might be able to work it out on three and a half or four years?
A. He said maybe five years.
Q. And that you would probably get to go home on weekends or leaves?
A. Yes, sir.
* * * * * *
Q. Now, if you want to explain something to me; certainly you are free to do so.
A. Okay, if I have to down there and spend 100 years, my conscience will be clear; and this is what I have to live with.
The state rested its case after other testimony, but it is apparent these three witnesses were the prime source of evidence for the prosecution.
A pretrial motion for disclosure was filed on behalf of the appellant on May 4, 1977. It sought "all concessions, promises, statements, capitulations, allowances and/or proposals made by the State to any and all co-indictees of the Defendant in return for pleas of guilty by any and all such co-indictees, and/or in return for testimony in this case by any and all such co-indictees." This motion was called to the court's attention prior to trial after the case had been removed to Clay County. After argument, the motion was overruled without prejudice, the court stating, "It is the Court's opinion that the matters sought to be discovered by the Defendant's Motion would be useful for purposes of impeaching the credibility of a witness if there were, in fact, any promises or recommendations made." Another motion for production of all statements of Bess Beane, Martha Sue Elmer and Richard Romanus was filed on *273 May 18 which does not appear to have been ruled upon by the court, but it was renewed with the addition, "for disclosure of any promise of immunity, of special consideration or other inducement made by any person for and on behalf of the State to Mr. Romanus, Mrs. Beane, Mrs. Elmer or any other person who will be called as a witness by the State," and was again overruled without prejudice.
During the trial, when Romanus was offered as a witness by the state, the defendant moved, outside the presence of the jury, to exclude any testimony by the witness because it was believed he had been promised immunity by the state which had not been divulged to the defendant although requested. Once again the objection was overruled without prejudice. A similar motion was made to the testimony of Martha Sue Elmer and it was also overruled. And, finally, when the state rested, the defendant again moved to exclude the testimony upon the same basis with a similar result.
Mrs. King testified in her own behalf. She denied participating in a conspiracy to kill her husband. She stated that she attended a ball game on the evening of November 30 accompanied by her son and a younger daughter, a team member, who remained for another game. When she and her son returned to the residence, they found the body of Mr. King lying in a pool of blood in the den of their home. The son gave testimony that he had made certain the doors to the residence were locked before accompanying his mother to the game and, moreover, she had not insisted that he attend the game but rather inquired if he wanted to go. He also testified that his mother seemed irritated when his father did not appear for the game.
The jury returned a guilty verdict and afterward the trial judge called the attorneys into chambers and announced:
The Court makes this statement for the record that at the conclusion of the testimony of Rick Romanus in this case, the Court had intended to make a statement into the record as to a matter within the Court's knowledge and for the purpose of really protecting the integrity of the Court. At the conclusion of Mr. Romanus's testimony the Court did ask if the witness could be finally excused and the exact wording by Mr. Sullivan and Mr. Chapman I do not remember, but the indication was and the statement in the record was to the effect that he might be recalled as a witness, and the Court frankly overlooked calling you in here before the case went to the jury, but it would not really in the Court's opinion make any difference. I simply wanted to make this statement for the record, that the Court is aware of immunity being granted to Rick Romanus in this case and the reason that the Court did not divulge this is simply the Court's interpretation and opinion of the law pertaining awards of immunity or promises of awards to codefendants or coindictees and that such simply goes to the credibility of the witness to be brought out by cross examination. I have discussed this with the senior judge who was here in the Courtroom most of the two days of this trial and as I interpret the law it's my decision, but I am simply telling you this to protect the integrity of the Court, but I believe the law was that I was not required to divulge it, that it was the subject of cross examination only and that concludes what I have for the record, gentlemen.
* * * * * *
At the request of Mr. Coleman, I will add one statement to that record that at all times that I have conferred with Mr. Romanus's attorney, Mr. Louis Brindisi of Utica, New York, Mr. Brindisi maintained to the Court that he was not going to communicate this grant of immunity to the Defendant and that Mr. Grady Tollison of the Oxford Bar who the Court has talked to as recently as this afternoon, has informed the Court that he has never informed the Defendant Romanus of that fact and that concludes what I have for the record, gentlemen.
A motion for a new trial was filed and heard. It was established that Romanus had been granted immunity several months *274 before this trial with the concurrence of the trial judge and that the attorneys who participated in the immunity negotiations were directed by the judge not to disclose such fact.[1] It also reveals the sentences of Elmer and Beane, deferred at the time they testified, were later imposed with each receiving twenty-five years in the penitentiary rather than life imprisonment which is mandated by Mississippi Code Annotated section 97-3-21 (Supp. 1977), for murder convictions.
Although several assignments of error are urged for reversal, in our opinion, we need address only one because it is controlling and the others are not likely to recur. This assignment is:
The Court erred in permitting the jury to be led to believe that the defendant Romanus was then under a prosecutable indictment and that he would in fact, be prosecuted, when this was known by the Court and the State to be untrue and incorrect, as said witness had been granted immunity.
Initially, we state that nothing herein should be construed as comment on the guilt or innocence of this appellant. We speak only to her constitutional right to due process of law  a fair trial in accord with basic concepts of justice. In our opinion we must reverse because the appellant was not accorded a fair trial commensurate with the constitutional standards of this state or the United States.
The testimony of Romanus, whether true or untrue, was purchased by a grant of immunity,[2] specifically, freedom from life imprisonment. We, of course, do not know what effect the grant of freedom had upon his testimony, but the potential of its affecting the witness's credibility is so great that it cannot be ignored. A jury always has great responsibility in resolving factual disputes and its responsibility in cases of this nature is awesome. It needs, and the courts must afford, every proper assistance to the jury in its search for the truth. Essential to this effort is knowledge of the inducements likely to affect the witness's credibility so it may be considered by the jury in its deliberations.
The state contends, however, that the immunity, or knowledge of it, is newly-discovered evidence which comes within the criteria announced in United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), namely, (1) the truth of the newly-discovered evidence, and (2) the probative effect of such evidence toward a different result on a new trial. We reject this argument because we do not think the knowledge of immunity can be categorized as newly-discovered evidence since it was within the knowledge of the trial judge and the state's attorneys, and if it is presently to be considered newly discovered, it must be so because the previous motions to disclose had been improperly overruled and not due to lack of diligence by the appellant. Moreover, the truthfulness of Romanus' testimony could not likely be ascertained, in our opinion, without consideration of the witness's credibility. The importance of his testimony is obvious and it is also incriminating, but its effect, however material and relevant, could be instantly swept away if the jury believed it to be untrue, the product of purchase rather than material evidence honestly expressed.
A witness's credibility is of such importance in our system of justice that all courts recognize the great need for, and grant, broad scope upon cross-examination, but even then at times, regardless of the skillfulness of the cross-examination, essential facts, regretfully, do not come to the jury's attention. Presently, the court had knowledge of the immunity and in our opinion should have responded affirmatively to the motion to disclose rather than leave its discovery to the less certain standard of cross-examination.
*275 It is also argued that the fact of immunity was not communicated to Romanus, but only to his attorneys and therefore his credibility was not affected. We are not persuaded because we do not think it likely the state's attorney suggested immunity, dismissal of a murder indictment, unless the state needed the testimony for other convictions. Stated differently, if the testimony was forthcoming without immunity, there was no need to grant it; the quid pro quo was absent. Moreover, we are of the firm opinion that the knowledge of Romanus' attorneys must be imputed to him under these circumstances because we think it incredible that he testify and incriminate himself as he did without objection and interposition of his Fifth Amendment right by his attorneys. We also observe that the trial judge, the district attorney, and Romanus' attorneys all thought that he had been granted immunity.
Although we do not believe citation of authority is necessary for this opinion, it nevertheless may be found in nothing less than the United States Supreme Court. See Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972),[3] which is appended for the guidance of the bench and bar of the state. Compare Pittman v. State, 350 So.2d 67 (Miss. 1977).
REVERSED AND REMANDED.
SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE, BOWLING and COFER, JJ., concur.

APPENDIX I
 January 25, 1977
Mr. Louis Brindisi
Attorney at Law
747 Bleecker Street
Utica, N.Y. 13501
Re: State of Mississippi v. Romand J. Romanus
 a/k/a Richard Romanus, a/k/a
 Rick Romanus
Dear Mr. Brindisi:
The above named Defendant was indicted by the Lafayette County Grand Jury and charged with the crime of murder in that he on or about the 30th day of November, 1976, did willfully, unlawfully, feloniously and of his malice aforethought, kill and murder a human being, Bruce Belmont King, Jr. This indictment was filed and recorded on the 4th day of January, 1977 in the Clerk's office of Lafayette County.
It is the understanding of the undersigned that discussions have been had between the attorneys representing the Defendant and with the local prosecuting attorneys, namely, Ken Coleman, District Attorney for the Third Judicial District and Glen Alderson, Lafayette County Attorney.
That these discussions resulted in an agreement whereby the Defendant is to completely cooperate with the prosecuting attorneys and will sign a statement outlining in detail his involvement and knowledge of the crime as alleged in the indictment.
The Defendant further will testify at any trial regarding such crime when requested to do so by the prosecuting attorney.
That the Prosecuting Attorneys will nolle prosequi the indictment against the defendant and will grant him immunity from prosecution for any crime which may arise as a result of the Defendant's statement or his testimony.
That the Defendant shall fully cooperate with the prosecution in all hearings, trials, and other judicial proceedings regarding the murder of Bruce Belmont King, Jr.
If at anytime it shall develop that Romanus was present at the King residence at the time of the murder of Bruce King, then in such event the indictment against Romanus will not be nolle prosequi and Romanus will not be granted immunity from prosecution.
In the event that the above indictment is not dismissed for those reasons then any statement or evidence arising therefrom will not be used against him and will be entirely suppressed. *276 That the Circuit Court Judge for the Third Circuit Court District of Mississippi has been informed of the contents of this understanding between the parties and consents to this agreement.
Very truly yours,
KEN COLEMAN, DISTRICT ATTORNEY FOR THE THIRD JUDICIAL DISTRICT
By /s/ Charles W. Wright Asst. DA.
/s/ Glen Alderson 
COUNTY ATTORNEY OF
LAFAYETTE COUNTY
/s/ Louis T. Brindisi 
LOUIS T. BRINDISI
/s/ Grady F. Tollison, Jr. 
GRADY F. TOLLISON, JR.
I hereby approve and consent to the above and direct that none of the parties to this agreement shall disclose the contents hereof until further order of the Court.
/s/ William R. Lamb 
CIRCUIT COURT JUDGE

APPENDIX II
Mr. Chief Justice Burger delivered the opinion of the Court.
Petitioner was convicted of passing forged money orders and sentenced to five years' imprisonment. While appeal was pending in the Court of Appeals, defense counsel discovered new evidence indicating that the Government had failed to disclose an alleged promise made to its key witness that he would not be prosecuted if he testified for the Government. We granted certiorari to determine whether the evidence not disclosed was such as to require a new trial under the due process criteria of Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
The controversy in this case centers around the testimony of Robert Taliento, petitioner's alleged coconspirator in the offense and the only witness linking petitioner with the crime. The Government's evidence at trial showed that in June 1966 officials at the Manufacturers Hanover Trust Co., discovered that Taliento, as teller at the bank, had cashed several forged money orders. Upon questioning by FBI agents, he confessed supplying petitioner with one of the bank's customer signature cards used by Giglio to forge $2,300 in money orders; Taliento then processed these money orders through the regular channels of the bank. Taliento related this story to the grand jury and petitioner was indicted; thereafter, he was named as a coconspirator with petitioner but was not indicted.
Trial commenced two years after indictment. Taliento testified, identifying petitioner as the instigator of the scheme. Defense counsel vigorously cross-examined, seeking to discredit his testimony by revealing possible agreements or arrangements for prosecutorial leniency:
"[Counsel.] Did anybody tell you at any time that if you implicated somebody else in this case that you yourself would not be prosecuted?
"[Taliento.] Nobody told me I wouldn't be prosecuted.
"Q. They told you you might not be prosecuted?
"A. I believe I still could be prosecuted.
"Q. Were you ever arrested in this case or charged with anything in connection with these money orders that you testified to?
"A. Not at that particular time.
"Q. To this date, have you been charged with any crime?
"A. Not that I know of, unless they are still going to prosecute."
In summation, the Government attorney stated, "[Taliento] received no promises that he would not be indicted."
The issue now before the Court arose on petitioner's motion for new trial based on newly discovered evidence. An affidavit filed by the Government as part of its opposition to a new trial confirms petitioner's claim that a promise was made to Taliento *277 by one assistant, DiPaola,[1a] that if he testified before the grand jury and at trial he would not be prosecuted.[2a] DiPaola presented the Government's case to the grand jury but did not try the case in the District Court, and Golden, the assistant who took over the case for trial, filed an affidavit stating that DiPaola assured him before the trial that no promises of immunity had been made to Taliento.[3a] The United States Attorney, Hoey, filed an affidavit stating that he had personally consulted with Taliento and his attorney shortly before trial to emphasize that Taliento would definitely be prosecuted if he did not testify and that if he did testify he would be obliged to rely on the "good judgment and conscience of the Government" as to whether he would be prosecuted.[4]
The District Court did not undertake to resolve the apparent conflict between the two Assistant United States Attorneys, DiPaola and Golden, but proceeded on the theory that even if a promise had been made by DiPaola it was not authorized and its disclosure to the jury would not have affected its verdict. We need not concern ourselves with the differing versions of the events as described by the two assistants in their affidavits. The heart of the matter is that one Assistant United States Attorney  the first one who dealt with Taliento  now states that he promised Taliento that he would not be prosecuted if he cooperated with the Government.
As long ago as Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791, 794, 98 A.L.R. 406 (1935), this Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with "rudimentary demands of justice." This was reaffirmed in Pyle v. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942). In Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), we said, "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Id., at 269, 79 S.Ct. at 1177, 3 L.Ed.2d at 1221. Thereafter Brady v. Maryland, 373 U.S. at 87, 83 S.Ct. [1194], at 1197, 10 L.Ed.2d at 218 (1963), held that suppression of material evidence justifies a new trial "irrespective of the good faith or bad faith of the prosecution." See American Bar Association, Project on Standards for Criminal Justice, Prosecution Function and the Defense Function § 3.11(a). When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within this general rule. Napue, supra, 360 U.S. at 269, 79 S.Ct. at 1177, 3 L.Ed.2d at 1221. We do not, however, automatically require a new trial whenever "a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict... ." United States v. Keogh, 391 F.2d 138, 148 (CA2 1968). A finding of materiality of the evidence is required under Brady, supra, 373 U.S. at 87, 83 S.Ct. at 1196, 10 L.Ed.2d at 218. A new trial is required if "the false testimony could . . *278 in any reasonable likelihood have affected the judgment of the jury... ." Napue, supra, 360 U.S. at 271, 79 S.Ct. at 1178, 3 L.Ed.2d at 1222.
In the circumstances shown by this record, neither DiPaola's authority nor his failure to inform his superiors or his associates is controlling. Moreover, whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government. See Restatement (Second) of Agency § 272. See also American Bar Association Project on Standards for Criminal Justice, Discovery and Procedure Before Trial § 2.1(d). To the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it.
Here the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it.
For these reasons, the due process requirements enunciated in Napue and the other cases cited earlier require a new trial, and the judgment of conviction is therefore reversed and the case is remanded for further proceedings consistent with this opinion.
Reversed and remanded.
NOTES
[1] See Appendix I.
[2] Miss. Code Ann. § 99-15-53 (1972) authorizes a nolle prosequi, but see State v. Thornhill, 251 Miss. 718, 171 So.2d 308 (1965), and State v. Kennedy, 96 Miss. 624, 50 So. 978 (1910), which hold that a nolle prosequi does not in all events preclude further prosecution. It is not the same as immunity.
[3] See Appendix II.
[1a] During oral argument in this Court it was stated that DiPaola was on the staff of the United States Attorney when he made the affidavit in 1969 and remained on that staff until recently.
[2a] DiPaola's affidavit reads, in part, as follows:

"It was agreed that if ROBERT EDWARD TALIENTO would testify before the Grand Jury as a witness for the Government, ... he would not be ... indicted... . It was further agreed and understood that he, ROBERT EDWARD TALIENTO, would sign a Waiver of Immunity from prosecution before the Grand Jury, and that if he eventually testified as a witness for the Government at the trial of the defendant, JOHN GIGLIO, he would not be prosecuted."
[3a] Golden's affidavit reads, in part, as follows:

"Mr. DiPaolo ... advised that Mr. Taliento had not been granted immunity but that he had not indicted him because Robert Taliento was very young at the time of the alleged occurrence and obviously had been over-reached by the defendant Giglio."
[4] The Hoey affidavit, standing alone, contains at least an implication that the Government would reward the cooperation of the witness, and hence tends to confirm rather than refute the existence of some understanding for leniency.