# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-KA-01533-SCT

*JODON ANTONIO SLAUGHTER*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 2/11/2000 |
| TRIAL JUDGE: | HON. JERRY O. TERRY, SR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MICHAEL W. CROSBY |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEWITT T. ALLRED |
| DISTRICT ATTORNEY: | CONO A. CARANNA, II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/14/2002 |
| MOTION FOR REHEARING FILED: | 3/25/2002; denied 5/23/2002 |
| MANDATE ISSUED: | 5/30/2002 |

### BEFORE PITTMAN, C.J., EASLEY AND GRAVES, JJ.

### EASLEY, JUSTICE, FOR THE COURT:

¶1. Jodon Antonio Slaughter (Slaughter) was found guilty of the murder of Kelvin Reynolds (Reynolds) by a jury in the Circuit Court of Harrison County, First Judicial District. A mandatory sentence of life in prison was imposed on Slaughter. The trial court denied Slaughter's motion for judgment notwithstanding the verdict or alternatively, motion for a new trial. Slaughter now appeals to this Court.

## FACTS

¶2. At trial, a number of residents at the River 10 apartment complex in Gulfport, Mississippi, testified about what they observed on April 29, 1998. Sharon Patton (Patton), a resident of Apartment 70, was in the living room of her upstairs apartment when she heard an argument and a noise outside that "sounded like a firecracker." When she looked outside, directly below her balcony, she saw two men at a Ford Explorer. One of the men was sitting inside it, "hunched over" on the passenger side, and "the other man was reaching in with a gun." She stated that she saw "something shiny" that it looked like a "gun," and ran back inside. She then heard two or three more shots. She did not see the two men clearly enough to describe them.

¶3. Ronald Lawrence (Lawrence), a resident of Apartment 69, was on his balcony at about 9:30 p.m., when he became aware of an apparent argument or fight between two men. He saw a gun that was described as "nickel-plated,"and he saw a "silvery flash." He heard a bang and ran inside. He testified that he may have heard a few more shots. Lawrence recognized the victim, who had been there at the apartment complex for a few weeks, but he was unable to see the other man clearly enough to provide a description.

¶4. Alicia Mitchell (Mitchell), a resident of Apartment 53, was returning home from a shopping trip at about 9:30 p.m. that night. She heard a sound like a gunshot as she backed into a parking space approximately "five or more car lengths" from the Explorer. She saw what appeared to be "a person leaning over someone else, leaning into a vehicle." There was another couple of shots, and then "they" raced up, got into another parked car, and sped out in front of her car as they left the complex. She described the car that passed directly in front of her as "a teal blue colored car, a Mustang style." She went to the Explorer, where she confirmed her assumption that someone has been shot.

¶5. A number of Gulfport police personnel participated in the case. Officer Adam Cooper (Officer Cooper) responded to a "shots fired" call and found the deceased in the Ford Explorer. Officer Charles Horne (Officer Horne) collected shell-casings from an automatic weapon that night at the scene of the shooting. Subsequently, he recovered a projectile which a resident of the apartments had found. Officer Horne also identified fragments of metal and fragments of lead projectiles recovered during the autopsy of the victim and some cell phones and beepers recovered at the scene of the shooting. Detective Kevin Raymond (Detective Raymond) collected evidence from the interior of Reynolds's van, including three beepers, two of which were found on the center console and one of which was found in the front passenger door compartment. Detective Gregory Herman (Detective Herman) found the gun in the storm drain on August 25, 1998. Detective Rosario Ing (Detective Ing) reviewed a videotape of the Grand Casino's valet parking area taken at 9:08 p.m. on the night of the murder and identified Slaughter.

¶6. Valerie Seldon (Valerie) was an employee at the Grand Casino in Gulfport and a resident of Apartment 72. At the time prior to the shooting, Reynolds had been staying with her for two or three weeks while in the process of moving to the coast from Atlanta, Georgia, to start a pager and cellular phone repair business. Valerie and Reynolds became acquainted at the casino. She also met Slaughter at the same time as Reynolds.

¶7. During the day of April 29th, Reynolds was at the apartment, where Valerie observed him "constantly on the phone," "antsy" and "nervous." To her personal knowledge, he spoke with Slaughter several times during the day, and, to her personal knowledge, Reynolds knew that Slaughter was coming to Gulfport. Slaughter also wanted to use Reynolds's truck. She last saw Reynolds between 6:30 p.m. and 8:00 p.m., when she fell asleep. Valerie first learned of Reynolds's death when the police came to her apartment later that night.

¶8. Darryl Screven (Screven), a casino host at the Grand Casino, became acquainted with Slaughter sometime during 1996 or 1997, in connection with his casino employment. He met Reynolds during a trip to Atlanta to meet with Slaughter.

¶9. In April of 1998, Slaughter called Screven and informed him that he would be coming to Gulfport with Ken Ogletree (Olgetree) to patronize the Grand Casino. Screven met Slaughter, Ogletree and Tracy Stepney (Stepney) at the casino and had lunch with them on Wednesday, the day of the murder.

¶10. At about 7:00 that evening, Screven received a phone call from Reynolds, who said that Slaughter wanted to go to a shopping mall. However, only Screvens and Stepney went to the mall and returned to the casino at about 8:45 p.m.

¶11. Screven left to go home. On the way, he received a "succession of beeps" from Slaughter and

Reynolds. He stopped and called Slaughter, who asked him to come back to the casino. An arrangement had been made for Reynolds to bring his vehicle to the casino so that Slaughter could use it to go to New Orleans. Reynolds would then need a ride from the casino back to Valerie's apartment. Screven called Reynolds, who told him "basically the same thing." Screven returned to the casino, but Slaughter had departed. He called Valerie's apartment to find out if Reynolds was coming to the casino. When Screven spoke with Valerie, she told him "nothing concrete." He waited at the casino about ten minutes and then went home.

¶12. Screven learned later that night that Reynolds had been killed. Subsequently Screven was questioned by the police. The next morning, Slaughter called him to talk about checking out of the casino's hotel. Screven told Slaughter about Reynolds's "demise" and "that the police were looking for Slaughter."

¶13. Caroline Patton (Patton), a valet at Grand Casino, was working on the night of April 29, 1998. She knew Regina Richardson (Richardson) and was familiar with her car, a green Mustang. At about 9:00 p.m. or 9:15 p.m., that night, she saw Richardson at the casino with two men and a woman. Screven called, and Patton gave the phone to one of the men with Richardson, who spoke briefly with Screven. The car was brought around, and Patton saw the man who had talked on the phone to Screven get into Richardson's green Mustang and drive away. She could not say whether or not all three of the people got into Richardson's car. Screven called again, and she told him that they had just left.

¶14. Richardson, a dealer at the Grand Casino, become acquainted with Slaughter through her employment. She did not know Reynolds. She saw Slaughter at the casino early in the afternoon of April 29th, and they made plans at that time to go to New Orleans that night with two other people when she got off work. When she got off work at 7:00 p.m., she went home and changed clothes, got her green Mustang, and returned to the casino, where Slaughter and Ogletree were still gambling. By about 9:00 p.m., she met Slaughter, Ogletree and Stepney in one of the hotel rooms, and they made plans to go out for the evening. Richardson had to take Slaughter to pick up this truck before going out for the evening. Since Richardson worked early the next day, they agreed that the four of them would go out somewhere locally afterwards instead of going to New Orleans.

¶15. During the evening, both in the casino and in the hotel room, Richardson was present when Slaughter talked on the phone numerous time with Reynolds. In the hotel room, Richardson saw Slaughter with a gun and put the holstered gun on his belt by his hip. It was Richardson's understanding from her conversations with Slaughter that he needed to pick up his friend's truck. Stepney asked Richardson whether she knew where Valerie lived. Richardson knew the apartment complex but she found Valerie's exact address by calling information.

¶16. Downstairs, Stepney changed her mind about going with them and went back into the hotel. Richardson drove Slaughter and Ogletree to the River 10 Apartments in her car.

¶17. En route, Slaughter, who was in the front passenger seat, spoke on the telephone two or three times with Reynolds. At the entrance to the apartment complex, Slaughter told Reynolds on the telephone that he was still at the casino. Slaughter told Reynolds to bring his vehicle to the casino and leave the keys with the valet. Slaughter told Reynolds that Screvens would give Reynolds a ride home. Slaughter also had spoken on the phone with Screvens and also had "led [Screvens] to believe that he was still at the casino" and that Reynolds would be delivering the vehicle to the casino.

¶18. Richardson drove around the apartment complex until Slaughter and Ogletree located the vehicle. She drove past the vehicle, a Ford Explorer, to the end of the parking area and was told to turn off her lights. She turned her car around and parked about one car past the Ford Explorer. Before she was completely stopped, Slaughter, without saying anything, got out of the car. Richardson did not know Reynolds, but she saw a man standing outside a ground-floor apartment.

¶19. Slaughter disappeared from Richardson's view. She parked the car, sat there for a couple of seconds, and turned to speak to Ogletree in the back seat. As she did so, she heard gunshots. She looked out and saw Slaughter at Reynolds's Explorer with the same "silver, big, shiny gun" in his hand that she had seen at the hotel.

¶20. She put the car in reverse, intending to flee, but Ogletree's presence indicated to her that she "could not leave," that she "had 'trouble' in [her] back seat." So she stopped, and Slaughter got back into the car. Richardson testified that "there was conversation that went sort of like - - and I'm paraphrasing: 'I killed him. I shot the m-----f-----.'" Slaughter gave the gun to Ogletree and tried not to made a mess with the blood on his clothes.

¶21. While driving back to the Grand Casino, they were stopped at a railroad crossing. Slaughter and Ogletree got out of the car. Slaughter then broke the gun into pieces and dropped the pieces into a drain pipe.

¶22. Back at the Grand Casino, Ogletree got out of the car, and Slaughter instructed Richardson to drive him to her house. They got to her house about 10:00 p.m. Slaughter put his bloodied clothes into a trash bag, took a shower, and put on a set of Richardson's workout clothes.

¶23. Richardson gave Stepney directions to the house on the telephone, and Stepney drove Ogletree over to Richardson's house. Ogletree brought Slaughter some new clothes, talked with Slaughter and then took the trash bag with him when he left.

¶24. Slaughter indicated that Ogletree was "supposed to go and discard the garments." He also told Richardson the story he wanted her tell the police about where they had been and what they had been doing that night. While Slaughter was still at the house, Richardson called her sister, Kelly Seldon (Seldon), in Atlanta and told her what had really happened. At about 1:00 a.m., Richardson drove Slaughter to a motel in the Moss Point/Pascagoula area where Ogletree and Stepney were waiting for him. Slaughter got out of the car and told Richardson to "keep it together," and Richardson drove home.

¶25. At work the next day, Richardson was picked up by the police and questioned. Thereafter, she had a telephone conversation with Slaughter. When she was questioned by the police, Richardson told them the story that Slaughter had fabricated. About two days after the murder, Richardson went to Atlanta and met with Slaughter.

¶26. Richardson was indicted for accessory to murder, after the fact, and she subsequently told the police what actually had happened that night and told them the location of the gun in the drain. The indictment was dropped with prejudice in exchange for her agreement to testify truthfully in the prosecution of Slaughter.

¶27. Crime Lab Technician Steve Byrd (Byrd), a forensic firearms examiner, test-fired the gun submitted to him for purposes of comparison with the bullets and shell-casings. He described the gun has having a "stainless steel finish." In Byrd's opinion, the gun's class characteristics were consistent with its having been

the gun that fired the projectiles. He considered the gun as a possible source for discharging the components; however, the particular components could not be positively included or excluded as having been discharged. Byrd could not state that the gun was the only source to discharge the components. Byrd testified that the gun's rusted condition could have had "an adverse effect on known test standards."

¶28. Richardson's roommate, Rhonda Reyna (Reyna), testified that she, her boyfriend, and Richardson's daughter came back to the apartment at about 10:00 p.m. after seeing a movie. Richardson and Slaughter were at the apartment. Later, another man came to the apartment. Richardson asked Reyna to hand her a trash bag that was in the living room. The second man left the apartment soon afterwards, but she did not see him leave.

¶29. Lemuel Murray (Murray) and Slaughter both worked for a car dealership in Atlanta. About ten days to two weeks prior to April 29, 1998, Murray and Slaughter spoke on the telephone and, at Slaughter's request, Murray went to Slaughter's home to talk with him. Slaughter told Murray that Reynolds "was a f------ rat, and he had people coming up from Miami bringing him a silencer, and he was going to blow Kelvin Reynolds's f------ head off."

¶30. The next time Murray spoke with Slaughter was on April 30, 1998, the day after the murder of Reynolds. Slaughter called Murray to tell him that he had just gotten back from Mississippi and that he was going to come by the car dealership to talk with Murray. When Slaughter came over there later, he asked Murray if he had heard what had happened to Reynolds last night. Murray replied that he had not. Slaughter told him that "the word was on the street that [I] had killed Kelvin Reynolds." Slaughter then talked on the phone with Ogletree, and, as he was leaving the dealership he said to Murray, "Do you think they got the message?"

¶31. Linda Dugan (Dugan), a resident of Georgia and Slaughter's former spouse, knew Reynolds for less than a year. Prior to his departure from Georgia on or about April 29th, Slaughter invited Dugan to go to Gulfport with him, but she did not go with him. On the night of April 29-30, 1998, Slaughter called Dugan and stated he was in Mississippi. She asked him if he was "taking care of business", and he said, "Yes, you'll read about it [in the paper]." She did not know at the time what his "business" in Mississippi was, except that he was going there to gamble. Later on the morning of the 30th, at about 10:00 a.m., Slaughter called her again and asked her if she had heard what had happened to Reynolds.

¶32. Richardson's sister, Seldon, stated that on the night of the murder, Richardson called and told her about the murder. Seldon did not know Reynolds. She had met Slaughter on an occasion when they both were gambling at the Grand Casino in Gulfport, but the first time she "actually met him eye to eye" was when he showed up at her house a day or two after Reynolds was killed. Richardson was at Seldon's house at the time, and Richardson left Seldon's house with Slaughter. Thereafter, Seldon became personally acquainted with Slaughter and he stated that Reynolds was "his best friend and he hated what he had to do to him."

## STATEMENT OF THE ISSUES

**I. Whether the trial court erred by refusing to allow disclosure to the jury of evidence of federal prosecution immunity agreements.**

**II. Whether the prosecutor's opening and closing arguments were prejudicial**.

**III. Whether the trial court erred by refusing to allow a "great care and caution" jury instruction.**

## DISCUSSION

### I. Immunity Agreements

¶33. Slaughter first complains that the trial court erred by refusing to allow him to disclose federal immunity agreements to the jury for material witnesses. The specific witnesses in question are Murray, Seldon, Dugan and Richardson. The State of Mississippi also had an immunity agreement with Richardson in regard to the murder of Reynolds.

¶34. This Court has held that "reversible error results when evidence of an immunity agreement between the State and its key witness is removed from the jury's consideration." *Morgan v. State*, 703 So.2d 832, 840 (Miss.1997)(citing *King v. State*, 363 So.2d 269, 274 (Miss.1978); *Suan v. State*, 511 So.2d 144, 146-48 (Miss.1987); *Foster v. State*, 508 So.2d 1111, 1112-15 (Miss.1987); *Malone v. State*, 486 So.2d 367, 367-69 (Miss.1986); *Fuselier v. State*, 468 So.2d 45, 51-52 (Miss.1985)).

¶35. Slaughter claims that witnesses, Murray, Seldon, Dugan and Richardson, testified to having immunity agreements and their testimony should have been disclosed to the jury.[1]

¶36. Murray testified at trial. In a proffer before the judge and outside the presence of the jury, Murray testified that he received use immunity from the federal government concerning alleged crimes involving Slaughter and Reynolds. The trial judge excluded this information stating that the federal immunity given Murray had nothing to do with the prosecution of Slaughter in the murder case. The trial judge stood by this ruling and excluded the testimony as to the immunity pursuant to M.R.E. 403.

¶37. At trial, defense counsel maintained that Seldon had a use immunity agreement with the federal government as indicated in federal grand jury testimony. Further, Slaughter cites federal jury testimony that indicates Seldon had a cooperation /use immunity agreement.

¶38. The State stipulated, based on federal grand jury testimony, that Dugan had entered into an immunity agreement with the federal government. The type of immunity, use or transactional, was unknown to the State. The federal grand jury testimony, is also unclear as to the type of immunity granted to Dugan. "[A]n appellant is responsible for bringing to our attention and presenting to this court a record of trial proceedings sufficient to undergird his assignments of error." *Winters v. State*, 473 So.2d 452, 457 (Miss. 1985).

¶39. Richardson testified in a proffer of evidence by Slaughter and outside the presence of the jury. On cross-examination by the State, she stated that her immunity from the federal government had nothing to do with this trial. Furthermore, the federal government was not investigating her nor was she facing federal charges. Subsequently, Richardson testified before the jury that she was indicted for accessory to murder by the State of Mississippi. In addition, she stated that in exchange for statements and cooperating in the investigation, the indictment against her was dropped with prejudice.

¶40. The trial judge did not allow any proffer or testimony from the federal case to go before the jury. Further, he stated that the immunity agreement for the accessory after the fact indictment was already before the jury.

¶41. Murray, Seldon and Dugan were never indicted in Mississippi in connection with the murder of Reynolds. Their immunity was solely with the federal government concerning other alleged crimes separate and distinct from the murder of Reynolds. From the record, it appears that they received use immunity agreements. While these witnesses may have known of some alleged involvement of Slaughter in the murder of Reynolds, there is no indication that the federal government offered any immunity from prosecution concerning the Reynolds murder.

¶42. Richardson also, apparently, had immunity from the federal government. However, she was also indicted by the State of Mississippi as an accessory after the fact for the murder of Reynolds. There was an immunity agreement between Richardson and the State of Mississippi. In exchange for truthful testimony and cooperation with the State of Mississippi in the prosecution of Slaughter for the murder of Reynolds, the State dropped the indictment with prejudice against Richardson. This was complete immunity from State prosecution. The immunity agreement between Richardson and the State of Mississippi was disclosed to the jury at trial.

¶43. As to the federal immunity agreements for the witnesses, no promise was made not to prosecute the witnesses in regard to the murder of Reynolds. The federal case did not focus on Reynolds's murder, but on other alleged federal crimes. Richardson, the key witness of the State of Mississippi in the Reynolds murder trial was offered complete immunity by the prosecution in exchange for truthful testimony. The immunity agreement between the State and Richardson was before the jury. Therefore, the issue is without merit.

## II. Opening and closing statements

¶44. Slaughter next complains of prosecutorial misconduct in opening and closing statements.

### Standard of Review

¶45. The standard of review that appellate courts must apply to lawyer misconduct during opening statements or closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created. *Sheppard v. State*, 777 So.2d 659, 660 (Miss. 2000)(citing *Ormond v. State*, 599 So.2d 951, 961 (Miss.1992)).

### A. Opening Statements

¶46. Slaughter claims that during opening statements the prosecution stated alleged facts that could not reasonably be expected to offer into evidence. The prosecutor stated the following in his opening statement:

> Remember, this happened April 29 of 1998. In August, I think the 25th, almost four months to the day, she told the police the rest of the story. And they went out on Railroad Street in the City of Gulfport and started checking storm drains. And guess what they found: A silver 9 millimeter pistol down in the storm drain with the handle busted off of it. Guess what else they found when they cleaned the rust off of it and got the solvents and cleaned it engraved on the barrel: **"Walt Stepney, Jr."** It's Tracy Stepney's daddy's gun she had given to Jodon to fix. It's still got "Stepney" written on it.

(emphasis added). Slaughter claims that there was no expectation that Tracy Stepney's father gave her the gun, nor that she had given the gun to Slaughter to "fix." Further, he argues that at the first opportunity an

objection was made and he moved for a mistrial.

¶47. A careful review of the record reveals that Slaughter made no contemporaneous objection during the prosecutor's opening statement. The first time Slaughter brought this issue to the trial court's attention was after the prosecution completed its opening statement and prior to the defense's opening statement. This Court held that "[i]f no contemporaneous objection is made, the error, if any, is waived." *Walker v. State*, 671 So.2d 581, 597 (Miss. 1995) (citing *Foster v. State*, 639 So.2d 1263, 1270 (Miss. 1994)). *Hill v. State*, 432 So.2d 427, 439 (Miss. 1983). An appellate court is under no obligation to review an assignment of error when an objection was not made or when an objection was untimely. *Carr v. State*, 655 So.2d 824, 832 (Miss. 1995). The contemporaneous objection rule is in place to enable the court to correct an error with proper instructions to the jury whenever possible. *Gray v. State*, 487 So.2d 1304, 1312 (Miss. 1986) (citing *Baker v. State* 327 So.2d 288, 292-93 (Miss. 1976)).

¶48. The trial court addressed a number of issues at this time, including the prosecutor's opening statements. Slaughter simply requested a mistrial based on the prosecutor's comments. The trial court overruled the motion for mistrial. Clearly, Slaughter is procedurally barred for lack of a contemporaneous objection.

¶49. As to Slaughter's motion for mistrial, the standard of review for a denial of a motion for mistrial is abuse of discretion. *Spann v. State*, 771 So.2d 883, 889 (Miss. 2000). *Witherspoon v. State*, 441 So.2d 1363 (Miss. 1983). However, an objection is usually made before a motion for mistrial. The objection provides the trial court an opportunity to sustain an objection, and if requested admonish the jury to disregard the remark.

¶50. This Court has held that trial judge is in the best a position to determine if an alleged objectionable remark has a prejudicial effect. *Roundtree v. State*, 568 So.2d 1173, 1177 (Miss. 1990). "The judge is provided considerable discretion to determine whether the remark is so prejudicial that a mistrial should be declared." *Id.* at 1778. If serious and irreparable damage has not occurred, then the trial judge should direct the jury to disregard the remark. *Id.* at 1778.

¶51. In the case sub judice, Slaughter failed to contemporaneously object at trial to the statements made by the prosecution. As such, any error is waived. *Walker v. State*, 671 So.2d at 597.

¶52. Procedural bar aside, the opening statement by the prosecution was not unduly prejudicial. The trial court warned the jury prior to opening statements, stating "Opening statements are intended to assist you in understanding how the evidence will unfold from the witness stand itself. You must keep in mind that these opening statements are not in evidence. You are not to consider it as evidence. It's sort of an outline that you can follow." This Court has held that "[t]he purpose of an opening statement is to inform the jury what a party to the litigation expects the proof to show. Sometimes the proof does not follow the expectations of the party's attorney in opening statement and, if so, that failure usually militates against the party." *Crenshaw v. State*, 513 So.2d 898, 900 (Miss. 1987).

¶53. The jury was properly instructed by the trial judge that opening statements are not evidence. As to the motion for mistrial, Slaughter failed to make a contemporaneous objection on which the judge could make a ruling. There was no error and no abuse of discretion by the trial judge in allowing the prosecution's opening statement to be heard by the jury and in overruling the motion for mistrial.

### B. Closing Statements

¶54. Slaughter also claims that the prosecutor again referred to matters not in evidence in closing argument. Slaughter cites the following excerpts from the prosecutor's closing argument:

We also talked about the various rules of court; that it was not a function of you as jurors to rule on the various objections that would come form the attorneys. There is obviously -- even more than I think either Mr. Crosby or I could have anticipated -- but there is a wealth of information that's been developed over the last two years about this case. As is obvious to you now, **a lot of it was not able to be given to you under these rules of court from either side**.

Mr. Crosby: Objection, Your Honor.

The Court: Don't comment on what was not given.

Mr. Crosby: And move for a mistrial with respect to his improper comment.

The Court: Overruled. The jury will disregard the argument that there was something that you did not hear.

Proceed.

Slaughter also cites the following closing excerpt:

I mean, what a coincidence. What a strange little turn of events. And I've got to tell you, as a prosecutor who needs some luck now and then, when you get this gun back there, you're going to have to turn the paper so you can see it. Manipulate it around right here. Right engraved on that barrel there: "Walt Stepney, Jr." What a little piece of coincidence that the girl, who at the time the defendant was beating this on the ground and stuffing it in the drainage pipe over on 42nd Avenue, **the girl, whose father owns this gun**, is at the Grand Casino packing everything in a duffle bag fixing to get the hell out of Gulfport and back to Atlanta. What a little funny turn of a coincidence they would have you believe. Consistent with Regina's story, what she told the police four months later.

¶55. This Court has held that attorneys are allowed wide latitude in closing arguments. ***Holly v. State***, 716 So.2d 979, 988 (Miss. 1998); ***Wilcher v. State***, 697 So.2d 1087, 1010 (Miss. 1997). In addition, the "court should also be very careful in limiting free play of ideas, imagery, and personalities of counsel in their argument to [a] jury." ***Ahmad v. State***, 603 So.2d 843, 846 (Miss. 1992). Any alleged improper comment must be viewed in context, taking the circumstances of the case into consideration. ***Id.*** The trial judge is in the best a position to determine if an alleged objectionable remark has a prejudicial effect. ***Roundtree***, 568 So.2d at 1177.

¶56. If sustaining the objection alone is considered to be inadequate to remove the alleged prejudicial effect of the objected matter from the minds of the jury, then the court must be requested to instruct the jury to disregard the matter. ***Anderson v. Jaeger***, 317 So.2d 902, 906 (Miss. 1975). The jury is presumed to understand that the court disapproves of any testimony when an objection is sustained. ***Estes v. State***, 533 So.2d 437, 439 (Miss. 1988).

¶57. In the closing argument a prosecutor is allowed to argue evidence that has been admitted. ***Brooks v. State***, 763 So.2d 859, 864 (Miss. 2000). However, "arguing statements of fact that are not in evidence or necessarily inferable from it which are prejudicial to the defendant is error." ***Id. Dancer v. State***, 721

So.2d 583 (Miss. 1998); *Banks v. State*, 725 So.2d 711 (Miss. 1997). This Court does not condone the prosecution stating matters not in evidence and potentially causing the jury to disfavor the defendant. *Brooks*, 763 So.2d at 864; *Banks*, 725 So.2d at 711.

¶58. "The test for determining if improper argument by the prosecutor to the jury requires reversal is 'whether the natural and probable effect of the improper argument of the prosecuting attorney is to create an unjust prejudice against the accused as to result in a decision influenced by the prejudice so created." *Brooks*, 763 So.2d at 864 (quoting *Davis v. State*, 660 So.2d 1228, 1248 (Miss. 1995)).

¶59. Slaughter claims that the reference to the gun by the prosecution, in the opening and closing statements, is the only link to show how he allegedly acquired the gun that was used in the shooting. In the case sub judice, the statements made by the prosecution do not warrant reversal. The fact that the prosecution commented on the ownership of the gun does not rise to the level of unjust prejudice in this case.

¶60. The gun was admitted into evidence during the testimony of Officer Herman. In addition, Richardson testified that Stepney was with Slaughter, Ogletree and her at the hotel on the night of the murder. Since the gun is in evidence, any writings on the gun would be proper for comment.

¶61. Moreover, the testimony of numerous witnesses at the apartment complex described a gun that was shiny, silvery, or nickel-plated. Richardson stated that she saw Slaughter place a "silver, big, shiny gun" in a holster on his hip. Richardson also testified that she heard shots being fired at the scene. Slaughter had the same silver, shiny gun in his hand that he had in the hotel. Furthermore, according to Richardson, Slaughter returned to the car bloodied and stated something along the line of "I killed him." The gun allegedly was disposed of in a drain near a railroad crossing by Slaughter and Ogletree. Information provided by Richardson enabled the police to recover a gun by the railroad crossing. The crime lab technician testified that the recovered gun's characteristics were consistent with it being the gun that fired the projectiles and a possible source for discharging the components. There is substantial testimony in the record pertaining to the gun, separate and apart from the comments made by the prosecution, to provide the jury with enough information to link the recovered gun to Slaughter. Accordingly, the facts of this case do not warrant reversal. To the extent that any prejudice may have arisen by the prosecutor's comments, the error is harmless. This issue is without merit.

### III. Great Care and Caution Jury Instruction

¶62. Slaughter contends that the trial court erred in refusing jury instruction D-5 and D-unnumbered pertaining to a great care and caution instruction. Slaughter claims that Richardson was an accomplice to the murder. In addition, Slaughter maintains that should this Court agree with his immunity argument, then the great care and caution instruction should also apply to Murray, Seldon and Dugan. We find that there was no error in excluding the proffered testimony as to Murray, Seldon and Dugan's federal immunity and, therefore, no such instruction should apply to them.

¶63. Jury Instruction D-5 read as follows:

> The testimony of an alleged accomplice is to be considered and weighed with great care and caution and suspicion. You may give it such weight and credit as you deem it is entitled.

Jury instruction D-unnumbered reads as follows:

The testimony of one who provides evidence against the defendant for immunity from punishment must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses. You the jury should consider and weigh such testimony with great care and caution and suspicion. You may give it such weight and credit as you deem it is entitled.

Both instructions were refused by the trial court. While Slaughter maintains that Richardson was an accomplice, she was actually indicted by the State of Mississippi as an accessory after the fact, not an accomplice.

## Standard of review

¶64. It is within the discretion of the trial court to grant a cautionary instruction pertaining to the testimony of an accomplice witness. ***Burke v. State***, 576 So.2d1239, 1242 (Miss. 1991). The discretion is not absolute and may be abused. ***Id***.

¶65. This Court, in ***Wheeler v. State***, 560 So.2d 171 (Miss. 1990), held the following:

In ***Van Buren v. State***, 498 So.2d 1224, 1229 (Miss.1986), this Court said, "the granting of a cautionary instruction regarding the testimony of an accomplice is discretionary with the trial judge." (Citations omitted). However, that discretion is not absolute; it may be abused. 522 So.2d at 754.[(2)]

The ***Derden*** case stated that two of the aspects in determining whether a trial judge has abused his discretion concerning a "caution and suspicion" instruction are: (1) was the witness an accomplice; and, (2) was his testimony without corroboration. In ***Green v. State***, 456 So.2d 757, 758 (Miss.1984), this Court said that a judge's discretion is subject to abuse when the State's evidence rests solely upon the testimony of an accomplice and there is some question as to the reasonableness and consistency of the testimony, or the defendant's guilt is not clearly proven.

*See also* ***Williams v. State***, 729 So.2d 1181, 1188 (Miss. 1998); ***Holmes v. State***, 481 So.2d 319, 323 (Miss. 1985).

¶66. This Court has defined an accomplice in prior case law. "An accomplice is a person who is implicated in the commission of a crime." ***Brewer v. State***, 725 So.2d 106, 124 (Miss. 1998). An accomplice has also been defined by this Court as "a person who is implicated in the commission of the crime. That is to say, that if the evidence admits a reasonable inference that the witness may have been a co-perpetrator or the sole perpetrator the cautionary instruction should be given." ***Williams v. State***, 729 So.2d 1181, 1188 (Miss. 1998)(citing ***Dedeaux v. State***, 125 Miss. 326, 87 So.664 (1921)); ***Burke v. State***, 576 So.2d at 1242.

¶67. An accessory after the fact has been defined by this Court as "a person assisting one who has completed the commission of a felony to avoid being apprehended, arrested, convicted, etc." ***Chase v. State***, 645 So.2d 829, 851 (Miss. 1994).

¶68. The Court of Appeals in ***Smothers v. State***, 756 So.2d 779, 787 (Miss. Ct. App. 1999), had a similar situation as the case at hand, in which the court held the following:

The disputed jury instruction characterized Carney as either a co-defendant or an accomplice of

Smothers, even though Carey was only charged as an accessory after the fact which was later dismissed. A cautionary instruction about accomplice testimony is not required unless there is an accomplice. Since Carney was neither an accomplice nor a co-defendant and Smothers failed to present any evidence to the contrary, the cautionary instruction requested was correctly denied, and this assignment of error is without merit.

Likewise, Richardson was not an accomplice. She was indicted for accessory after the fact. Further, her testimony was corroborated by other witnesses. Since the facts of the case sub judice fail to meet the *Derden* test for giving cautionary instructions, the trial court was within its discretion and correctly refused the instruction. Accordingly, this issue is without merit.

## CONCLUSION

¶69. For these reasons, the judgment of the Circuit Court of Harrison County is affirmed.

¶70. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**PITTMAN, C.J., McRAE AND SMITH, P.JJ., WALLER, COBB, DIAZ, CARLSON AND GRAVES, JJ., CONCUR.**

1. Apparently, the F.B.I. and Secret Service had been investigating a number of crimes in Atlanta. These alleged crimes did not include the murder of Reynolds although some of the testimony concerned the murder.

2. *Derden v. State*, 522 So.2d 752, 759 (Miss. 1988).